# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION; AMERICAN CIVIL LIBERTIES UNION FOUNDATION; NEW YORK CIVIL LIBERTIES UNION; and NEW YORK CIVIL LIBERTIES UNION FOUNDATION,<br><br>       Plaintiffs,<br><br>       v.<br><br>JAMES R. CLAPPER, in his official capacity as Director of National Intelligence; KEITH B. ALEXANDER, in his official capacity as Director of the National Security Agency and Chief of the Central Security Service; CHARLES T. HAGEL, in his official capacity as Secretary of Defense; ERIC H. HOLDER, in his official capacity as Attorney General of the United States; and ROBERT S. MUELLER III, in his official capacity as Director of the Federal Bureau of Investigation,<br><br>       Defendants. | No. 13-cv-03994 (WHP)<br><br>**ECF CASE** |

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 2

   I.     The government errs in describing the standard of review............................................ 2

   II.    The mass call-tracking program exceeds statutory authority ........................................ 3

      a.     Section 215 does not authorize the program ............................................................. 3

      b.     Plaintiffs' statutory claim is not impliedly precluded ................................................. 10

   III.   The mass call-tracking program violates the Fourth Amendment ................................. 10

   IV.   The mass call-tracking program violates the First Amendment .................................... 15

   V.    Plaintiffs have shown irreparable harm, and both the balance of the
equities and the public interest weigh in favor of an injunction .................................. 18

CONCLUSION.................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Aguilar v. ICE*, 811 F. Supp. 2d 803 (S.D.N.Y. 2011) .................................................. 19

*Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240 (3d Cir. 2003) ........................... 20

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806 (2011) ....................... 16

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30 (2d Cir. 2010) .............................................................................................. 3

*EEOC v. Commercial Office Prods. Co.*, 486 U.S. 107 (1988) ...................................... 7

*Families for Freedom v. U.S. Customs & Border Prot.*, 837 F. Supp. 2d 287 (S.D.N.Y. 2011) .................................................................................................... 15

*In re Application of the U.S.*, 830 F. Supp. 2d 114 (E.D. Va. 2011) ............................ 7

*In re Elec. Privacy Info. Ctr.*, No. 13-58, 2013 WL 5702390 (U.S. Oct. 11, 2013) ...................... 4

*In re Production of Tangible Things from [Redacted]*, No. BR 08-13 (FISA Ct. Dec. 12, 2008) .................................................................................................... 6

*In re Production of Tangible Things from [Redacted]*, No. BR 08-13 (FISA Ct. Mar. 2, 2009) ............................................................................................... 9, 13

*Johnson v. Kay*, 860 F.2d 529 (2d Cir. 1988) ................................................................ 2

*LaRouche v. Kezer*, 20 F.3d 68 (2d Cir. 1994) ............................................................... 2

*Local 1814, Int'l Longshoremen's Ass'n, AFL–CIO v. Waterfront Comm'n of N.Y. Harbor*, 667 F.2d 267 (2d Cir. 1981) .......................................................... 17

*Memphis Planned Parenthood, Inc. v. Sundquist*, 175 F.3d 456 (6th Cir. 1999) ........................ 20

*Moore v. Obama*, No. 09-5072, 2009 WL 2762827 (D.C. Cir. Aug. 24, 2009) ........................ 15

*N.Y. Progress & Protection PAC v. Walsh*, No. 13-3889, 2013 WL 5746142 (2d Cir. Oct. 24, 2013) ......................................................................................... 20

*O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973 (10th Cir. 2004) ............................................................................................................ 2

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978) ............................................. 8

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) ........................................................... 19

*SEC v. Citigroup Global Mkts. Inc.*, 673 F.3d 158 (2d Cir. 2012) ................................................ 19

*Shelton v. Tucker*, 364 U.S. 479 (1960) ................................................................................. 17, 18

*Smith v. Dep't of Labor*, 798 F. Supp. 2d 274 (D.D.C. 2011) ....................................................... 15

*Smith v. Maryland*, 442 U.S. 735 (1979) ................................................................................ 11, 12

*Tabbaa v. Chertoff*, 509 F.3d 89 (2d Cir. 2007) ............................................................................ 16

*United States v. Epstein*, 620 F.3d 76 (2d Cir. 2010) ...................................................................... 7

*United States v. Jones*, 132 S. Ct. 945 (2012) ......................................................................... 11, 12

*United States v. Knotts*, 460 U.S. 276 (1983) ............................................................................... 11

*United States v. R. Enters.*, 498 U.S. 292 (1991) ............................................................................. 8

*United States v. Smith*, 499 U.S. 160 (1991) ................................................................................... 6

*Wright v. Giuliani*, 230 F. 3d 543 (2d Cir. 2000) ............................................................................ 3

*XL Specialty Ins. Co. v. Level Global Investors, L.P.*, 874 F. Supp. 2d 263
(S.D.N.Y. 2012) ........................................................................................................................... 2

**Statutes**

13 U.S.C. § 8 ...................................................................................................................................... 5

13 U.S.C. § 9 ...................................................................................................................................... 5

18 U.S.C. § 2703 ................................................................................................................................ 4

18 U.S.C. § 2709 ................................................................................................................................ 6

18 U.S.C. § 2712 .............................................................................................................................. 10

50 U.S.C. § 1822 ................................................................................................................................ 5

50 U.S.C. § 1842 ................................................................................................................................ 5

50 U.S.C. § 1861 ..................................................................................................................... 6, 7, 8, 9

50 U.S.C. § 1862 ................................................................................................................................ 9

50 U.S.C. § 1881 ................................................................................................................................ 5

**Other Authorities**

151 Cong. Rec. S13441 (2005) .......................................................................................................... 8

Hearing of the Privacy and Civil Liberties Oversight Board on Legal Perspectives
(July 9, 2013) .................................................................................................................... 3

James G. Carr, *A Better Secret Court*, N.Y. Times, July 22, 2013 .................................................. 4

Letter from Ronald Weich, Assistant Attorney General, to Hon. Nydia Velázquez,
Chair, Congressional Hispanic Caucus, U.S. House of Representatives (Mar. 3,
2010) .................................................................................................................................. 5

Office of Legal Counsel, *Memorandum Opinion for the General Counsel [of the]
Federal Bureau of Investigation: Requests for Information Under the
Electronic Communications Privacy Act* (Nov. 5, 2008) .......................................................... 5

Office of the Inspector General, A Review of the Federal Bureau of
Investigation's Use of Section 215 Orders for Business Records (2007) .................................. 6

## INTRODUCTION

The NSA's ongoing monitoring of Plaintiffs associations is unlawful. The statute that the government relies on cannot be used to collect call records. Even if it could be used for this purpose, the mass call-tracking program involves collection on a scale far beyond what the statute permits. It far exceeds the scope of collection that the government could conduct with a grand-jury or administrative subpoena, and the government cannot conceivably demonstrate, as the statute requires it to, that there are reasonable grounds to believe that all Americans' call records, over a seven-year period (and counting), are relevant to an ongoing investigation.

Moreover, the program would be foreclosed by the Constitution even if it were authorized by statute. It is unreasonable within the meaning of the Fourth Amendment. It also violates the First Amendment by unjustifiably intruding on Plaintiffs' associational privacy and chilling communications that are central to Plaintiffs' work.

Plaintiffs are likely to succeed on the merits, but other factors weigh in favor of preliminary relief here as well. The ongoing surveillance of their associations is causing irreparable injury to Plaintiffs' privacy and associational rights. And both the balance of equities and the public interest weigh in favor of injunctive relief. While the government once contended in ex parte proceedings before the FISC that the program was the "only effective means" of achieving its ends, it retreats from that claim here. Further, record evidence confirms that the government could achieve its ends without assembling a comprehensive database of Plaintiffs' call records.

The government has no legitimate interest in infringing unnecessarily, and indefinitely, the constitutional rights of Plaintiffs and hundreds of millions of others. Plaintiffs respectfully submit that preliminary relief is warranted.

**ARGUMENT**

**I.      The government errs in describing the standard of review.**

Plaintiffs' motion for a preliminary injunction seeks to preserve the status quo while this litigation proceeds. It would bar the government, during the pendency of this litigation, from acquiring *more* of Plaintiffs' call records and from conducting *additional* queries of Plaintiffs' records or using identifiers associated with Plaintiffs. Pl. PI Br. 2; *see also Johnson v. Kay*, 860 F.2d 529, 541 (2d Cir. 1988). The government states that Plaintiffs seek a "mandatory" injunction, Gov't PI Opp. 11, but this is incorrect. "[I]t is long settled that the "'[s]tatus quo" to be preserved by a preliminary injunction is the last actual, peaceable uncontested status which preceded the pending controversy,'" not the situation existing when the lawsuit was first filed. *XL Specialty Ins. Co. v. Level Global Investors, L.P.*, 874 F. Supp. 2d 263, 272 (S.D.N.Y. 2012) (quoting *LaRouche v. Kezer*, 20 F.3d 68, 74 n. 7 (2d Cir. 1994)); *see O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004) (McConnell, J., concurring). Here, the dispute relates to the government's collection of Plaintiffs' call records, and the "last actual, peaceable uncontested status" existed before the government launched the mass call-tracking program. Thus, Plaintiffs' motion is a motion to preserve the status quo—that is, a motion for a prohibitory injunction rather than a mandatory one.

Because they seek a prohibitory injunction, Plaintiffs must satisfy a familiar standard: They must show, first, that they are more likely than not to succeed on the merits of their claims at trial or on summary judgment; and, second, that they are likely to suffer irreparable injury if

preliminary relief is not granted. *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). Plaintiffs have made this showing.[1]

## II.    The mass call-tracking program exceeds statutory authority.

### a.    Section 215 does not authorize the program.

The government's argument that the call-tracking program is statutorily authorized lacks merit. As an initial matter, the government is misguided in contending that the Court owes deference to the FISC judges who authorized or reauthorized the program. Gov't PI Opp. 16–17; *id.* at 18 (contending that this Court can find the call-tracking program unlawful only by concluding that the FISC judges "lacked any reasonable basis" for authorizing it). The question before this Court is not whether the FISC judges had any reasonable basis for ruling as they did, but whether the program is consistent with the statute. Indeed, deference to the FISC would be particularly inappropriate here because that court has heard argument only from the government, and because many of the arguments that Plaintiffs present here have presumably never been presented to it, let alone by a party with an interest in presenting them persuasively. *Cf.* Hearing of the Privacy and Civil Liberties Oversight Board on Legal Perspectives at 29:52–32:46 (July 9, 2013), http://cs.pn/177IpII (former FISC Judge James Robertson stating that the one-sided FISC process is better described as "approval" than as "adjudication," particularly with respect to applications for "programmatic surveillance"); James G. Carr, *A Better Secret Court*, N.Y.

---

[1] The government errs in stating that any preliminary injunction that would "affect government action taken in the public interest pursuant to a statutory scheme" is a mandatory injunction. Gov't PI Opp. 11. This factor controls a different question: A plaintiff cannot justify the entry of a preliminary injunction where this factor is present merely by demonstrating that there are "sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party." *Wright v. Giuliani*, 230 F. 3d 543, 547 (2d Cir. 2000). But Plaintiffs are not arguing that preliminary relief is warranted because they satisfy the "serious questions" standard; rather, they argue that they meet the more demanding "likelihood-of-success" standard. Pl. PI Br. 8.

Times, July 22, 2013, http://nyti.ms/16VSd6A (former FISC judge arguing that allowing for adversarial proceedings before the FISC "would result in better judicial outcomes").[2]

On the merits, the government's statutory argument is unpersuasive for three reasons.

First, the government fails to explain why Section 215 can be used to collect call records at all. On its face, Section 215 provides the government with general authority to compel the disclosure of tangible things. But as Plaintiffs have noted, at the same time that Congress enacted Section 215 in 2001, it added a provision to the Stored Communications Act ("SCA") that specifically addresses the circumstances in which the government can compel the disclosure of call records in particular. *See* Pl. MTD Opp. 15–16. The SCA provision states that a "provider of remote computing service or electronic communication service to the public shall not knowingly divulge a record or other information pertaining to a subscriber to or customer of such service . . . to any governmental entity." 18 U.S.C. § 2702(a)(3). While the SCA provision lists exceptions to its otherwise-categorical prohibition, *see id.* §§ 2702(c), 2703, Section 215 is not among them. Again, this omission is particularly notable because Congress enacted the three provisions as part of the same bill.

The government's defense of the mass call-tracking program appears to rely on the theory that Section 215 constitutes an *implicit* exception to the SCA. This theory is misguided. In other contexts, the Justice Department has acknowledged that it would contravene the structure of the SCA to "infer additional exceptions" to the general "rule of privacy" set out in section

---

[2] While the government argues without foundation that the Court should defer to the FISC, it acknowledges, as it must, that this Court has jurisdiction to adjudicate Plaintiffs' claims. *See also* Opp. for United States at 15, *In re Elec. Privacy Info. Ctr.*, No. 13-58, 2013 WL 5702390 (U.S. Oct. 11, 2013) ("[T]he proper way for petitioner to challenge the Telephony Records Program is to file an action in federal district court . . . as other parties have done."); *id.* at 21 ("In general, no constitutional or procedural bar prohibits a plaintiff from seeking injunctive relief that, if granted, would conflict with an order previously entered in another proceeding to which the plaintiff was not a party.").

2702(a). Office of Legal Counsel, *Memorandum Opinion for the General Counsel [of the] Federal Bureau of Investigation: Requests for Information Under the Electronic Communications Privacy Act* at 3 (Nov. 5, 2008), http://1.usa.gov/14qGrjS (rejecting FBI's argument that agency's authority to compel disclosure of call-record information under "national security letter" authority should be construed broadly despite the "rule of privacy" set out in the SCA). In fact, the Justice Department relied on this view of the SCA's privacy rule to reassure legislators who raised concerns that the government might read Section 215 to implicitly supersede confidentiality protections set out in the Census Act, 13 U.S.C. §§ 8, 9, 214. "[I]f Congress intended to override these protections," the Justice Department wrote, "it would say so clearly and explicitly." Letter from Ronald Weich, Assistant Attorney General, to Hon. Nydia Velázquez, Chair, Congressional Hispanic Caucus, U.S. House of Representatives (Mar. 3, 2010), http://wapo.st/aEsETd.

There is no evidence at all—let alone "clear[] and explicit[]" evidence—that Congress intended Section 215 to override the SCA's privacy rule. Section 215 does not mention call records or the SCA. Moreover, it lacks the "notwithstanding any other provision" language that appears elsewhere in FISA. *See, e.g.*, 50 U.S.C. § 1842(a)(1) (pen registers and trap-and-trace devices); *id.* § 1822(a)(1) (physical searches); *id.* § 1881a(a) (targeting of foreign persons outside the United States). The omission of that phrase confirms that Section 215's general authority does not override statutory provisions that address certain classes of records more specifically.

The legislative history of the 2006 amendments to Section 215 is consistent with this understanding. According to a 2007 report issued by the Justice Department's Office of the Inspector General, lawyers in the Justice Department were at one point concerned that educational-records laws limited their ability to use Section 215 to compel the disclosure of

educational records. *See* Office of the Inspector General, A Review of the Federal Bureau of Investigation's Use of Section 215 Orders for Business Records at x, xvi (2007), http://1.usa.gov/1cajBGI (hereinafter "2007 OIG Report"). To address this perceived problem with the statute, Congress added language in 2006 indicating that certain categories of records (including educational records) were subject to Section 215, despite applicable confidentiality provisions elsewhere. *See* 50 U.S.C. § 1861(a)(3) (listing "library circulation records, library patron lists, book sales records, book customer lists, firearms sales records, tax return records, educational records, or medical records"); *see also* 2007 OIG Report at xvi (explaining that because of the conflict between educational-records laws and Section 215, the Department of Justice did not make any requests for educational records under Section 215 from 2002 to 2005, and that the 2006 Patriot Act amendments "addressed" the statutory "impediment"). Congress's omission of call records from the list must be given significance. *See United States v. Smith*, 499 U.S. 160, 167 (1991) ("Where Congress explicitly enumerates certain exceptions . . . additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.").[3]

---

[3] In a "Supplemental Opinion" dated December 12, 2008, the FISC concluded the SCA did not preclude the government from using Section 215 to obtain call records. *In re Production of Tangible Things from [Redacted]*, No. BR 08-13, slip op. at 5 (FISA Ct. Dec. 12, 2008), http://bit.ly/18LuFWQ. The FISC acknowledged that "section 2702, by its terms, describes an apparently exhaustive set of circumstances under which a telephone service provider may provide to the government non-content records pertaining to a customer or subscriber." *Id*. at 2. But the court reasoned that because section 2703 expressly authorizes the government to obtain call records with administrative subpoenas, which do *not* require prior judicial review, Congress could not have intended to prohibit the government from obtaining the same records with Section 215, which *does* require prior judicial review. *See id*. at 4–5.

It is easy to think of reasons, however, why Congress might have wanted the government's collection of call records to be conducted under the administrative-subpoena provisions, particularly 18 U.S.C. § 2709, rather than under Section 215. Perhaps Congress believed that the government's access to call-record information should be strictly limited to the categories of information set out in section 2709(b). Perhaps it believed that the government's required disclosures to Congress about its collection of call records in foreign-intelligence investigations under section 2709(e) should be comprehensive. Perhaps it believed that the broader legal

Second, the government's defense of the call-tracking program would fail even it were correct that Section 215 constitutes an implicit exception to section 2702(a)(3). This is because a Section 215 order cannot permissibly seek records beyond those that could be sought with a grand-jury or administrative subpoena. Pl. MTD Opp. 9–11; 50 U.S.C. § 1861(c)(2)(D). In eighty pages of briefing, the government fails to cite even one case in which a court upheld a grand-jury or administrative subpoena that sought records on this scale. *See* Gov't MTD Br. 24 (acknowledging that case law involving subpoenas "does not involve data acquisition on the scale of the telephony metadata collection authorized by the FISC."). The most the government can say is that some courts have upheld grand-jury subpoenas that sought "voluminous repositories of records." Gov't PI Opp. 20. Those repositories, however, were not remotely as voluminous as the one at issue here. Indeed, the single case the government's opposition brief cites in this context, *In re Application of the U.S.*, 830 F. Supp. 2d 114 (E.D. Va. 2011), involved a court order that sought the disclosure of records about eight specific people over a period of approximately one year. The case bears no resemblance at all to this one.

The government suggests that it is entitled to broader latitude under Section 215 because the mass call-tracking program involves the "counter-terrorism context." Gov't PI Opp. 20; Holley Decl. ¶¶ 17–18. But many grand-jury investigations relate to terrorism or espionage, and yet the fact remains that no grand-jury subpoena has ever reached as far as the call-tracking program does. If all Americans' call records are relevant to a terrorism investigation, as the

---

authority it gave the FBI under Section 215—to obtain "any tangible things"—should be subject to prior judicial oversight. An inquiry into Congress's intent is not necessary here, however, because the language of the SCA could not be clearer. *See United States v. Epstein*, 620 F.3d 76, 80 (2d Cir. 2010) ("The statutory text, however, is unambiguous, and we will not stretch to contradict the text where, as here, the plain meaning produces a result that is neither 'absurd' nor 'plainly at variance' with the policy of the legislation." (quoting *EEOC v. Commercial Office Prods. Co.*, 486 U.S. 107, 120 (1988)).

government says they are, why has no grand jury ever sought them? Moreover, the government's argument relies on a kind of double counting. Congress took the "counter-terrorism context" into account when it *drafted* the statute, and while it drafted a statute that afforded the government broad authority, it explicitly circumscribed that authority by providing that Section 215 orders should not be used to seek records beyond those that could be sought with a subpoena *duces tecum*. The government's argument that it should be afforded broader latitude is not an argument that the Court should interpret it broadly but an argument that Congress should rewrite it.

Third, even if the mass call-tracking program complies with the grand-jury limitation in section 1861(c)(2)(D), it does not comply with section 1861(b)(2)(A), which requires that there be "reasonable grounds to believe that the tangible things sought [with a Section 215 order] are relevant to an authorized investigation." The government conflates the two subsections, but as Plaintiffs have explained, Pl. MTD Opp. 12–13, the standard set out in section 1861(b)(2)(A) is in some respects more restrictive than the one that courts have applied to subpoenas. A grand-jury subpoena is lawful if there is a "reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of the grand jury's investigation." *United States v. R. Enters.*, 498 U.S. 292, 301 (1991). Similarly, an administrative subpoena is lawful if the records sought "bear[] on," or "reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). Section 1861(b)(2)(A), by contrast, requires that the government demonstrate reasonable grounds to believe that the tangible things sought "*are* relevant" (emphasis added). The legislative history makes clear that this requirement was meant to impose a meaningful limitation on the government's authority. *See* 151 Cong. Rec. S13441 (2005) (statement of Sen. Arlen Specter) (stating, with approval, that "law enforcement will face an

uphill battle in any effort to obtain a 215 order that does not fall into one of the three categories" of presumptive relevance set out in section 1861(b)(2)(A)).[4]

The government cannot establish that *all* call records are relevant. The government itself concedes that "the vast majority of the call detail records . . . do not document communications between terrorist operatives." Gov't PI Opp. 19. The FISC has said the same thing. *See In re Production of Tangible Things from [Redacted]*, No. BR 08-13, slip op. at 11–12 (FISA Ct. Mar. 2, 2009), http://1.usa.gov/14DDhzd ("Mar. 2, 2009 FISC Opinion"). The government's argument is that a tiny fraction of the call records may turn out to be useful—but this is at most an argument that *some* of the records *might* be relevant. It is not an argument that the records "*are* relevant."

The government contends that section 1861(b)(2)(A) is more *permissive* than the language generally used by courts evaluating grand-jury subpoenas. It argues that Congress's use of the phrase "authorized investigation" was intended to allow the government to obtain tangible things that are "necessary" to the use of certain analytical tools. Gov't PI Opp. 16; Gov't MTD Br. 24. As Plaintiffs have explained, however, Pl. MTD Opp. 12–13, other compulsory-disclosure statutes similarly use the phrase "relevant to an authorized investigation," and yet the government points to no evidence that any of these statutes has been interpreted in the way the government interprets section 1861(b)(2)(A) here. In any event, the government's affidavits do

---

[4] The government's argument that Plaintiffs are trying to graft onto the statute the restriction that Congress removed in 2001, Gov't PI Opp. 22, misunderstands Plaintiffs' argument, the pre-2001 statute, or both. The pre-2001 statute required the government to establish "specific and articulable facts to believe that the person to whom the records pertain[ed] [was] a foreign power or an agent of a foreign power." 50 U.S.C. § 1862(b)(2)(B) (2000 ed.). Plaintiffs do not contend that the current iteration of the statute requires anything of the kind. It does require, however, that the government show that the tangible things sought "are relevant," 50 U.S.C. § 1861(b)(2)(A), and the government cannot make this showing.

not actually support the claim that the collection of all Americans' call records is "necessary" in any ordinary sense of the word. *See infra* at 13.

In an effort to assure the Court that its theory would not bring *every* conceivable record within the reach of the statute, the government states that bulk telephony metadata has "distinctive characteristics not common to most other types of records." Gov't PI Opp. 21. As Plaintiffs have explained, however, many records share the supposedly distinctive characteristics of call records. *See* Pl. MTD Opp. 14 & n.8; Suppl. Felten Decl. ¶¶ 11–12 (explaining that email metadata, internet-usage history, internet-chat records, financial records, credit-card records, "and even portions of medical records" are structured and interconnected, as call records are). If the government's novel theory were adopted, there would be no obvious reason why the government could not use the statute to reach these kinds of records, too.

### b.   Plaintiffs' statutory claim is not impliedly precluded.

Insofar as the government argues that Plaintiffs' statutory claim is impliedly precluded by either 18 U.S.C. § 2712 or Section 215 itself, Plaintiffs have addressed that argument in their Brief in Opposition to Defendants' Motion to Dismiss and respectfully incorporate those points here. *See* Pl. MTD Opp. 18–26.

## III.   The mass call-tracking program violates the Fourth Amendment.

The government's ongoing and indefinite collection of all of Plaintiffs' call records is a search because aggregated call records contain extraordinarily intimate details about Plaintiffs and their associations. *See* Pl. PI Br. 16–23; Felten Decl. ¶¶ 38–64. That search is unreasonable both because it is warrantless, Pl. PI Br. 23–24, and because it attempts to serve the government's interests in the most indiscriminate manner possible—by pursuing discrete targets using dragnet means, Pl. PI Br. 24–29.

The government makes four arguments in defense of the program.

First, it insists that this case is controlled by *Smith v. Maryland*, 442 U.S. 735 (1979). Gov't PI Opp. 25–30. That simply is not correct. The question in *Smith* was only whether a specific individual—someone suspected of having committed a serious crime—had a reasonable expectation of privacy in the list of individuals he had called over the course of two days. Here, the question is whether Plaintiffs—who are not criminal suspects—have a reasonable expectation of privacy in a catalogue of the phone numbers, date, time, and duration of every single call they have placed or received over the last seven years (and will place or receive in the indefinite future). *Smith* did not address that question. The investigators in *Smith* did not assemble a massive database of every American's call records to target their suspect. Had they done so, the Supreme Court undoubtedly would have understood the case to present a vastly different question. *Cf. United States v. Knotts*, 460 U.S. 276, 284–85 (1983) (reserving question of whether the Fourth Amendment would treat dragnet location tracking differently from location tracking of a single individual).

In fact, the Supreme Court has never directly addressed the question presented here. The first time it addressed a question even remotely similar was in *United States v. Jones*, 132 S. Ct. 945 (2012), in which five Justices rejected the core premise of the government's argument in this case: that the Fourth Amendment is blind to the aggregation of sensitive data in massive government databases. *See* Pl. PI Br. 20–23. Even the Justices who believed that *Jones* could be decided based on the government's physical trespass onto private property recognized that the question of whether long-term aggregation of such information invades a reasonable expectation of privacy was a novel one, not controlled by prior precedent. *See Jones*, 132 S. Ct. at 954 ("It may be that achieving the same result through electronic means, without an accompanying

trespass, is an unconstitutional invasion of privacy, but the present case does not require us to answer that question.").

The government is correct that *Jones* did not decide the question presented here, but neither did *Smith*. Unquestionably relevant to whether *Smith* should be *extended* to this case, however, is the view, articulated by five Justices in two concurrences in *Jones*, that "longer term [electronic] monitoring"—even of information exposed to a third party—can implicate the Fourth Amendment. *See id.* at 964 (Alito, J., concurring); *id.* at 955 (Sotomayor, J., concurring). The government objects that Plaintiffs read *Jones* to have "overruled the third-party doctrine," *see* Gov't PI Opp. 29 n.18, but the government misunderstands Plaintiffs' argument. *Jones* and other recent cases confirm that the third-party doctrine is not (and has never been) an on–off switch. *See* Pl. MTD Opp. 15–16. That an individual has entrusted information to a third party or exposed it to the public is surely *relevant* to the question of whether she retains a reasonable expectation of privacy in that information, but it is not determinative.

Second, the government argues that the mass call-tracking program is reasonable under the "special needs" doctrine. Gov't PI Opp. 31–33. The government cannot satisfy the threshold requirements of that doctrine and has yet to explain its reliance upon it. *Compare* Gov't PI Opp. 31 n.19, *with* Pl. MTD Opp. 30–31 & n.12. Even assuming the doctrine applies, however, the mass call-tracking program is unreasonable because it employs a wildly indiscriminate means of collecting the information actually of interest to the government. *See* Pl. PI Br. 24–29.

To accomplish its narrow goal of discovering who is in contact with particular phone numbers (and who is in contact with those numbers, etc.), the government does not need everyone's phone records. As Professor Felten has explained in a supplemental declaration:

> There are a number of ways in which the government could perform three-hop analysis without first building its own database of every American's call records.

> For example, the government could obtain a single court order directing all (or perhaps even just the major) telephone companies to provide to the government the call records of everyone within three hops of a suspect's phone number. Using a straightforward algorithm (which I could describe at greater length if necessary), this order could be implemented using at most two queries to each telephone provider. Moreover, this process could easily be automated to make it virtually instantaneous. Each of the major telephone companies now subject to an order similar to the one revealed in June could create a simple electronic interface— known in the computer-programming profession as an Application Programming Interface, or API—that would be invoked by a government computer system to automate the collection of the data needed for a three-hop analysis of a specific target's phone number. The interfaces, working together to implement the algorithm referred to above, could perform the government's three-hop analysis essentially instantaneously—in a matter of seconds or less.

Suppl. Felten Decl. ¶¶ 6–7; *see also id.* ¶ 8 (responding to government's claims regarding specific uses of telephony metadata). Even the government appears to have accepted this fact. In *ex parte* proceedings before the FISC in 2008, the government represented that bulk collection of call records was the "only effective means" of tracking the associations of suspected terrorists. Mar. 2, 2009 FISC Opinion at 1–2. The declarations submitted by the government in this case do not include any similar representation. They state, quite ambivalently, only that the program provides the government with "one means" of tracking the associations of suspected terrorists. Holley Decl. ¶ 30; *see id.* ¶ 5 (program is "[o]ne method" of identifying terrorists); *id.* ¶ 9 ("can contribute"); *id.* ¶ 19 ("provides additional 'dots'"); *id.* ¶ 23 ("sometimes provides information earlier"); Shea Decl. ¶ 7 ("[o]ne method"); *id.* ¶ 58 ("part of this effort").

Third, the government contends that Plaintiffs' claims "depend on speculation about how the Government might use metadata related to their calls." Gov't PI Opp. 13. As Plaintiffs have explained, however, their principal concern is with the government's collection of the information in the first place. Pl. MTD Opp. 5–6; Compl. ¶¶ 1, 35. The government's arguments about the circumstances in which it uses, analyzes, and disseminates Plaintiffs' information, Gov't PI Opp. 2, 9, 13, do not even engage this complaint. In any event, even if the government

were correct that the Fourth Amendment does not apply until an NSA analyst reviews Plaintiffs' call records, the government's own representations make clear that Plaintiffs' call records *have* been reviewed. The NSA collects Plaintiffs' call records (and every American's call records) precisely so that it may query them, hundreds of times a year, to determine whether they have contacted a suspected terrorist, someone else who has contacted a suspected terrorist, or someone else who has contacted someone else who has contacted a suspected terrorist.[5]

Finally, the government continues to trivialize the sensitivity of the information collected under the program. None of the government's declarations, however, directly address Professor Felten's declaration, which makes clear that telephony metadata is "often a proxy for content," Felten Decl. ¶ 39, that telephony metadata about a single person reveals "an extraordinary amount about our habits and associations," *id.* ¶ 46, that such metadata is even more revealing when aggregated across time, *id.* ¶ 58, and that it is even more revealing when aggregated across many individuals, *id.* ¶ 62. Indeed, the government concedes that the call-tracking program has permitted it to construct a "comprehensive, historical repository" of citizens' communications with one another. *See* Gov't PI Opp. 4.

Relatedly, the government argues that the call-records database is minimally invasive because it houses telephone numbers, not names. Gov't PI Opp. 2. In this context, however, there is no practical difference between the two things. As Professor Felten explains, "it would be trivial for the government to obtain a subscriber's name once it has that subscriber's phone

---

[5] The government states that—assuming everyone has approximately 40 unique contacts—the number of phone numbers acquired in a three-hop analysis would be approximately 64,000. *See* Shea Decl. ¶ 25 n.1. That depends. If the government collects the *call records* of everyone within three hops of its "seed," then it will have collected the call records of over 64,000 people but the *phone numbers* of over 2.5 million people. If, however, it collects only the *phone numbers* of everyone within three hops of its "seed," then the government is correct. It is within the government's power to resolve this ambiguity.

number," Suppl. Felten Decl. ¶ 3, using publicly available resources, *id.* ¶ 4. This is so because "phone numbers are unique identifiers." *Id.* ¶ 3; *see also* Felten Decl. ¶ 19 & n.14. For this reason, the government itself treats phone numbers as identifying information in, for example, the context of Freedom of Information Act requests. *See, e.g.*, *Moore v. Obama*, No. 09-5072, 2009 WL 2762827, at *1 (D.C. Cir. Aug. 24, 2009) (per curiam) (affirming FBI's withholding of employee phone numbers); *Smith v. Dep't of Labor*, 798 F. Supp. 2d 274, 284 (D.D.C. 2011) ("Generally, personal identifying information such as a person's name, address, phone number, date of birth, criminal history, medical history, and social security number may be protected under Exemption 6."); *Families for Freedom v. U.S. Customs & Border Prot.*, 837 F. Supp. 2d 287, 302 (S.D.N.Y. 2011).[6]

## IV.    The mass call-tracking program violates the First Amendment.

The mass call-tracking program violates the First Amendment by placing in the government's hands a detailed record of every single one of Plaintiffs' telephonic associations. *See* Pl. PI Br. 31–32. It separately violates the First Amendment by discouraging Plaintiffs' most sensitive sources from calling Plaintiffs for fear of government scrutiny. *See* Pl. PI Br. 32–34.

The government's arguments to the contrary lack merit. First, the government argues that the mass call-tracking program is a "good-faith governmental investigation[] conducted in observance of the Fourth Amendment," Gov't PI Opp. 33, but as Plaintiffs have explained at length, and as the Second Circuit has conclusively held, the First Amendment has force independent of the Fourth Amendment. *See* Pl. MTD Opp. 36–39; *Tabbaa v. Chertoff*, 509 F.3d

---

[6] To be clear, Plaintiffs do not argue that their phone numbers are themselves private. To the contrary, many if not all of their numbers are publicly available (including, for example, by virtue of being listed in the signature blocks of court filings). Many of Plaintiffs' associations, however, are private, and the government's tracking of Plaintiffs' phone calls intrudes on the privacy of those associations.

15

89, 102 n.4 (2d Cir. 2007). Relatedly, the government claims that the mass call-tracking program is not directed at Plaintiffs' First Amendment activity. *See* Gov't PI Opp. 36–37. This is not true: The very purpose of the program is to collect and analyze records of Plaintiffs' telephonic associations, as well as those of millions of other Americans. *See* Pl. MTD Opp. 39. But even if that were not the case, both direct and indirect burdens on First Amendment rights must withstand exacting scrutiny where the burdens are substantial. *See* Pl. MTD Opp. 39–40; *see also Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2813 (2011).

Second, the government asserts that Plaintiffs have offered no evidence that "the metadata of any of their communications . . . have ever been accessed or reviewed by NSA analysts for any purpose." *See* Gov't PI Opp. 34. As noted above, the government collects Plaintiffs'—and every other American's—telephony metadata precisely so that it may search their associations, and the government has acknowledged having done so hundreds of times in 2012 alone. *See* Pl. PI Opp. 6. In any event, the government's collection of Plaintiffs' call records itself invades Plaintiffs' associational privacy. *See also* Pl. PI Br. 31–32.

The government all but ignores this direct associational injury. Instead, it focuses on Plaintiffs' claim that government whistleblowers, among others, will be wary of contacting Plaintiffs knowing that the government receives a record of every call made to Plaintiffs on an ongoing daily basis. The government has not disputed the evidence that those sorts of individuals have made confidentiality in their association with Plaintiffs an express condition of contact. *See, e.g.*, German Decl. ¶¶ 23–25, 28–30; Shapiro Decl. ¶ 8; Dunn Decl. ¶ 9.

Moreover, because demonstrating chill would require proving a negative, courts take a realistic approach to evidence of harm. In *Shelton v. Tucker*, the Supreme Court invalidated an Arkansas law that required teachers to "disclose every single organization with which [they had]

been associated over a five-year period." 364 U.S. 479, 487–88 (1960). The Court had little

trouble concluding that "to compel a teacher to disclose his every associational tie is to impair

that teacher's right of free association." *Id.* at 485–86. The Second Circuit later discussed *Shelton*

in explaining that "a factual record of past harassment is not the only situation in which courts

have upheld a First Amendment right of non-disclosure." *Local 1814, Int'l Longshoremen's*

*Ass'n, AFL–CIO v. Waterfront Comm'n of N.Y. Harbor*, 667 F.2d 267, 271 (2d Cir. 1981). In

*Shelton*, the Second Circuit observed, the Supreme Court "adopted a commonsense approach and

recognized that a chilling effect was inevitable if teachers who served at the absolute will of

school boards had to disclose to the government all organizations to which they belonged." *Local*

*1814*, 667 F.2d at 272. The same is true here: It is common sense that government

whistleblowers, for instance, will hesitate to call Plaintiffs knowing of the mass call-tracking

program. Were Congress tomorrow to enact a statute requiring every American to keep a log of

every phone call he or she made and then provide it to the NSA at the end of each day, no one

would for a moment question whether that implicated the First Amendment. The mass call-

tracking program, for these purposes, is no different.

Finally, the government argues that the mass call-tracking program survives "exacting

scrutiny" because the government's interests cannot be achieved through narrower means. *See*

Gov't PI Opp. 38. As explained above, this is not true. The government need not assemble an

enormous database of the nation's call records to track the associations of suspected terrorists.

*See* Suppl. Felten Decl. ¶¶ 6–9; Pl. PI Br. 35. Moreover, several members of the Senate Select

Committee on Intelligence who have reviewed the government's case for the mass call-tracking

program, have argued that it does not provide "any uniquely valuable intelligence," Pl. PI Br. 35

(quoting Senators Ron Wyden and Mark Udall), meaning that the government can obtain the

information it needs using existing authorities.

Once again, the Supreme Court's analysis in *Shelton* is instructive. Faced with an associational dragnet considerably less intrusive than the mass call-tracking program but nearly as indiscriminate, the Court articulated its flaw in this way:

> The question to be decided here is not whether the State of Arkansas can ask certain of its teachers about all their organizational relationships. It is not whether the State can ask all of its teachers about certain of their associational ties. It is not whether teachers can be asked how many organizations they belong to, or how much time they spend in organizational activity. The question is whether the State can ask every one of its teachers to disclose every single organization with which he has been associated over a five-year period. The scope of the inquiry required by [the statute] is completely unlimited. The statute requires a teacher to reveal the church to which he belongs, or to which he has given financial support. It requires him to disclose his political party, and every political organization to which he may have contributed over a five-year period. It requires him to list, without number, every conceivable kind of associational tie—social, professional, political, avocational, or religious. Many such relationships could have no possible bearing upon the teacher's occupational competence or fitness.

*Shelton*, 364 U.S. at 487–88. For similar reasons, the mass call-tracking program violates the First Amendment.

**V.  Plaintiffs have shown irreparable harm, and both the balance of the equities and the public interest weigh in favor of an injunction**.

Plaintiffs have shown irreparable harm: the NSA's long-term recording of their metadata is a direct and immediate injury to their privacy. The government argues that Plaintiffs' metadata is not private and that, in any event, Plaintiffs cannot establish that it is reviewed by the NSA, *see* Gov't PI Opp. 14 & n.6—but neither is true. Plaintiffs' metadata contains sensitive details of their contacts and associations, and the NSA combs through five years' worth of this metadata every time it performs a query. *See supra* at 13–14. Moreover, the Court is entitled to presume irreparable harm. The government cites cases involving copyright, patent, and other statutory claims to argue that this presumption no longer holds, *see* Gov't PI Opp. 14 n.6, but the

18

presumption continues to apply where *constitutional* violations are alleged, as here. *See, e.g.*, *Aguilar v. ICE*, 811 F. Supp. 2d 803, 828 (S.D.N.Y. 2011).

In addition to the traditional factors courts consider when evaluating the propriety of injunctive relief, *see* Pl. PI Br. 8 (discussing likelihood of success on the merits and irreparable injury), the Second Circuit has sometimes addressed other considerations, such as the balance of hardships or the public interest. *See, e.g.*, *Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010); *SEC v. Citigroup Global Mkts. Inc.*, 673 F.3d 158, 163 n.1 (2d Cir. 2012). *But see Salinger*, 607 F.3d at 80 n.8 ("This Court has rarely considered the public's interest before deciding whether an injunction should issue.").

Here, the balance of hardships favors Plaintiffs. As Plaintiffs have explained at length, the mass call-tracking program effects an ongoing invasion of their right to privacy. Each day brings new and irreparable incursions, with no end in sight. Moreover, the preliminary relief Plaintiffs seek would not prejudice the government because, as discussed above, the government has alternative methods of obtaining the call records of suspected terrorists and their contacts without collecting Plaintiffs' call records. Further, the government dramatically overstates the difficulty of implementing the requested injunction. As Professor Felten explains in his supplemental declaration, six months is an "implausible estimate for the time necessary to develop the software to quarantine the ACLU's call records." Suppl. Felten Decl. ¶ 14. He continues:

> There are a number of ways that the government could efficiently and effectively quarantine the ACLU's call records. For example, the NSA could deploy an automated script that would search its database for the ACLU's call records and move those records to another database that would not be accessed except at the direction of the Court. It could also apply a filter to its three-hop analysis such that any call to or from an ACLU number would be ignored (as would any other call down the chain from any such call). Indeed, it appears that the NSA already has the ability to filter its three-hop analysis to exclude certain phone numbers.

> *See, e.g.*, David S. Kris, *On the Bulk Collection of Tangible Things* 13–14, 1
> Lawfare Research Paper Series No. 4 (Sept. 29, 2013) ("NSA technicians may
> access the metadata to make the data more useable—e.g., to create a 'defeat list'
> to block contact chaining through 'high volume identifiers' presumably associated
> with telemarketing or similar activity." (quoting orders of the Foreign Intelligence
> Surveillance Court)).

*Id.* ¶ 15.

Finally, the requested injunction would not harm the public interest. *See, e.g.*, *N.Y. Progress & Protection PAC v. Walsh*, No. 13-3889, 2013 WL 5746142, at *3 (2d Cir. Oct. 24, 2013); *Memphis Planned Parenthood, Inc. v. Sundquist*, 175 F.3d 456, 495 (6th Cir. 1999) ("[T]he public is certainly interested in preventing the enforcement of unconstitutional statutes and rules; therefore, no harm to the public will result from the issuance of the injunction here."). The government has no legitimate interest in conducting surveillance that violates both FISA and the Constitution. *See Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003).

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion.

Dated: October 25, 2013

Christopher T. Dunn (CD-3991)
Arthur N. Eisenberg (AE-2012)
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, NY 10004
Phone: (212) 607-3300
Fax: (212) 607-3318
aeisenberg@nyclu.org

Respectfully submitted,

/s/ Jameel Jaffer

Jameel Jaffer (JJ-4653)
Alex Abdo (AA-0527)
Patrick Toomey (PT-1452)
Brett Max Kaufman (BK-2827)
Catherine Crump (CC-4067)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2500
Fax: (212) 549-2654
jjaffer@aclu.org

**CERTIFICATE OF SERVICE**

I, Jameel Jaffer, certify that on October 25, 2013, I served the foregoing Reply in Support of Plaintiffs' Motion for a Preliminary Injunction and accompanying papers upon Defendants, by operation of the Court's electronic filing system:


/s/ Jameel Jaffer
Jameel Jaffer

October 25, 2013