**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

AMERICAN CIVIL LIBERTIES UNION; AMERICAN
CIVIL LIBERTIES UNION FOUNDATION; NEW YORK
CIVIL LIBERTIES UNION; and NEW YORK CIVIL
LIBERTIES UNION FOUNDATION,

          Plaintiffs,

          v.

JAMES R. CLAPPER, in his official capacity as Director
of National Intelligence; KEITH B. ALEXANDER, in his
official capacity as Director of the National Security
Agency and Chief of the Central Security Service;
CHARLES T. HAGEL, in his official capacity as Secretary
of Defense; ERIC H. HOLDER, in his official capacity as
Attorney General of the United States; and ROBERT S.
MUELLER III, in his official capacity as Director of the
Federal Bureau of Investigation,

          Defendants.

13 Civ. 3994 (WHP)

ECF Case

## REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

STUART F. DELERY
Assistant Attorney General

JOSEPH H. HUNT
Director

ANTHONY J. COPPOLINO
Deputy Director

JAMES J. GILLIGAN
Special Litigation Counsel

MARCIA BERMAN
Senior Trial Counsel

BRYAN DEARINGER
RODNEY PATTON
Trial Attorneys
U.S. Department of Justice
Washington, D.C.

PREET BHARARA
United States Attorney for
the Southern District of New York

DAVID S. JONES
TARA M. La MORTE
JOHN D. CLOPPER
CHRISTOPHER HARWOOD
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, NY 10007
Tel. No. (212) 637-2739 (Jones)
Fax No. (212) 637-2730
david.jones6@usdoj.gov
tara.lamorte2@usdoj.gov
john.clopper@usdoj.gov
christopher.harwood@usdoj.gov

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................................1

ARGUMENT............................................................................................................1

POINT I:       PLAINTIFFS HAVE NOT ESTABLISHED THEIR STANDING ........................1

POINT II:      PLAINTIFFS' STATUTORY CLAIM IS IMPLIEDLY
               PRECLUDED..........................................................................................4

POINT III:     THE GOVERNMENT'S BULK COLLECTION OF TELEPHONY
               METATADA IS AUTHORIZED UNDER SECTION 215 ....................................9

POINT IV:      THE GOVERNMENT'S COLLECTION OF TELEPHONY
               METADATA DOES NOT VIOLATE PLAINTIFFS' FOURTH
               AMENDMENT RIGHTS ..........................................................................15

POINT V:       PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED THAT THE
               TELEPHONY METADATA COLLECTION PROGRAM VIOLATES
               THE FIRST AMENDMENT .......................................................................18

CONCLUSION......................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*ASARCO Inc. v. Kadish*,
    490 U.S. 605 (1989)...........................................................................................2

*Amidax Trading Gr. v. SWIFT SCRL*,
    671 F.3d 140 (2d Cir. 2011)..........................................................................3

*In re Application of the FBI for an Order Requiring the Prod. of Tangible Things from*
    *[Redacted]*,
    Dkt. No. BR13-158, Mem. (F.I.S.C. Oct. 11, 2013)................................... *passim*

*In re Application of the U.S. for an Order Pursuant to 18 U.S.C. § 2703(d)*,
    830 F. Supp. 2d 114 (E.D. Va. 2011) .............................................................6

*In re Application for Pen Register and Trap/Trace Device*,
    396 F. Supp. 2d 747 (S.D. Tex. 2005) ..........................................................14

*Arias-Zeballos v. Tan*,
    2007 WL 210112 (S.D.N.Y. Jan. 25, 2007) ...................................................7

*Ark. Dairy Co-op Assn., Inc. v. USDA*,
    573 F.3d 815 (D.C. Cir. 2009)........................................................................9

*Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*,
    536 U.S. 822 (2002).......................................................................................16

*Block v. Cmty. Nutrition Inst.*,
    467 U.S. 340 (1984)................................................................................ *passim*

*Bond v. United States*,
    131 S. Ct. 2355 (2011)....................................................................................2

*Bowman Dairy Co. v. United States*,
    341 U.S. 214 (1951).......................................................................................11

*Clapper v. Amnesty Int'l USA*,
    133 S. Ct. 1138 (2013)..............................................................................2, 4

*Clark v. Library of Congress*,
    750 F.2d 89 (D.C. Cir. 1984)........................................................................19

*Council for Urological Interests. v. Sebelius*,
    668 F.3d 704 (D.C. Cir. 2011)........................................................................9

*EEOC v. Shell Oil Co.*,
    466 U.S. 54 (1984)..................................................................................13

*Fighting Finest, Inc. v. Bratton*,
    95 F.3d 224 (2d Cir. 1996).....................................................................20

Foreign Intelligence Surveillance Court,
    Opinion of August 29, 2013........................................................... *passim*

*In re Fontaine*,
    402 F. Supp. 1219 (E.D.N.Y. 1975) .......................................................11

*Forest Grove Sch. Dist. v. T.A.*,
    557 U.S. 230 (2009)................................................................................13

*Haig v. Agee*,
    453 U.S. 280 (1981)................................................................................13

*Horton v. California*,
    496 U.S. 128 (1990)..................................................................................2

*Jewel v. NSA*,
    2013 WL. 3829405 (N.D. Cal. July 23, 2013)..........................................8

*Kastigar v. United States*,
    406 U.S. 441 (1972)..................................................................................4

*Koretoff v. Vilsack*,
    614 F.3d 532 (D.C. Cir. 2010)..................................................................9

*Kyllo v. United States*,
    533 U.S. 27 (2001)....................................................................................3

*Laird v. Tatum*,
    408 U.S. 1 (1972)......................................................................................4

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)..................................................................................2

*Lyng v. UAW*,
    485 U.S. 360 (1998)................................................................................20

*MacWade v. Kelly*,
    460 F.3d 260 (2d Cir. 2006)....................................................................17

*Maryland v. King*,
    133 S. Ct. 1958 (2013)........................................................................................18

*Nat'l Council of La Raza v. Gonzales*,
    468 F. Supp. 2d 429 (E.D.N.Y. 2007), *aff'd*, 283 Fed. Appx. 848 (2d Cir. 2008) .............2

*Nat'l Treasury Emps. Union v. Von Raab*,
    489 U.S. 656 (1989)........................................................................................17

*NRDC v. Johnson*,
    461 F.3d 164 (2d Cir. 2006)..................................................................................4

*Okla. Press Pub. Co. v. Walling*,
    327 U.S. 186 (1946).................................................................................11, 14

*In re Prod. of Tangible Things From [Redacted]*,
    Dkt. No. B.R. 08-13............................................................................................15

*Rakas v. Illinois*,
    439 U.S. 128 (1978)............................................................................................2

*Reporters Comm. for Freedom of the Press v. AT&T Co.*,
    593 F.2d 1030 (D.C. Cir. 1978)............................................................................19

*Sackett v. EPA*,
    132 S. Ct. 1367 (2012)........................................................................................8

*In re Sealed Case*,
    310 F.3d 717, 738, 742 (F.I.S.C.R. 2002) ...........................................................17

*In re Sealed Case*,
    42 F.3d 1412 (D.C. Cir. 1994)............................................................................11

*Smith v. Maryland*,
    442 U.S. 735 (1979).................................................................................3, 15, 18

*Stanford v. Texas*,
    379 U.S. 476 (1965)..........................................................................................19

*Tabbaa v. Chertoff*,
    509 F.3d 89 (2d Cir. 2007)..................................................................................19

*Texas v. Brown*,
    460 U.S. 730 (1983)............................................................................................3

*United States v. Abu-Jihaad*,
    630 F.3d 102 (2d Cir. 2010)...................................................................17

*United States v. Clutter*,
    674 F.3d 980 (8th Cir. 2012) ...................................................................3

*United States v. Gonzales*,
    520 U.S. 1 (1997)...................................................................................15

*United States v. Jones*,
    132 S. Ct. 945 (2012).............................................................................15

*United States v. Licata*,
    761 F.2d 537 (9th Cir. 1985) ...................................................................3

*United States v. Nixon*,
    418 U.S. 683 (1974)...............................................................................11

*United States v. Place*,
    462 U.S. 696 (1983).................................................................................3

*United States v. R. Enters., Inc.*,
    498 U.S. 292 (1991)...............................................................................12

*United States v. U.S. Dist. Court (Keith)*,
    407 U.S. 297 (1972)...............................................................................16

*United States v. VanLeeuwen*,
    397 U.S. 249 (1970).................................................................................2

*Vernonia Sch. Dist. 47J v. Acton*,
    515 U.S. 646 (1995)...............................................................................18

## STATUTES

5 U.S.C. § 701 ..............................................................................................5

5 U.S.C. § 702 ..............................................................................................5

50 U.S.C. § 1803 ..........................................................................................5

50 U.S.C. § 1861..................................................................................*passim*

18 U.S.C. § 2712..................................................................................5, 7, 8

**LEGISLATIVE MATERIAL**

H.R. Conf. Rep. No. 109-333 ...................................................................................12

H.R. Rep. No. 109-174 ..................................................................................6, 7, 12

S. Rep. No. 109-85...................................................................................................12

**MISCELLANEOUS**

*Implementation of the USA PATRIOT Act: Hearing Before the H. Subcomm.*
    *on Crime, Terrorism, and Homeland Security, Comm. on the Judiciary,*
    109th Cong. at 65 (2005) ....................................................................................6

Peter Wallsten, *House Panel Withheld Document on NSA Surveillance Program*
    *from Members*, Wash. Post, Aug. 16, 2013 .......................................................13

## PRELIMINARY STATEMENT

Plaintiffs' opposition to Defendants' motion to dismiss fails to advance persuasive arguments in support of their statutory or constitutional challenges to the telephony metadata program carried out under Section 215. Defendants have shown that the program – which plays an important role in the Government's ongoing efforts to defend the Nation against the threat of terrorist attack – is authorized by statute, and lawful under the Constitution.[1] Indeed, the FISC again so concluded only recently.[2] Plaintiffs fail to rebut these conclusions, or to overcome the jurisdictional hurdles to bringing their claims in the first place. This action should be dismissed.

## ARGUMENT

**POINT I:     PLAINTIFFS HAVE NOT ESTABLISHED THEIR STANDING**

In their opposition, Plaintiffs attempt to insert a new theory of standing nowhere pled in the Complaint – that the Government's collection of business records created and maintained by third-party telecommunications providers that contain metadata about Plaintiffs' calls itself constitutes "a gross invasion of their privacy," regardless of whether the data are ever reviewed. Pls.' MTD Opp. at 6; *id.* at 7 (asserting an "intrusion into their associational privacy"). This effort to recast their allegations should be rejected. The Complaint alleges that telephony metadata could be used to identify persons who associate with Plaintiffs, and that the metadata program may "chill" unnamed third parties from contacting them. As Defendants have shown, and Plaintiffs fail to refute, both injuries are too speculative to satisfy the requirement of injury

---

[1] *See generally* Defs.' Mem. of Law in Support of Mot. to Dismiss the Compl. (Dkt. No. 33) ("Defs.' MTD"). Plaintiffs' Mem. of Law in Opp. to Defs.' Mot. to Dismiss (Dkt. No. 60) is cited herein as "Pls.' MTD Opp." Specialized terms used but not otherwise defined herein shall have the same meaning as in Defs.' MTD and in Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction (Dkt. No. 61) ("Defs.' PI Opp.").

[2] *See In re Application of the Federal Bureau of Investigation for an Order Requiring the Prod. of Tangible Things from [Redacted]*, Dkt. No. BR13-158, Mem. (F.I.S.C. Oct. 11, 2013) ("Oct. 11 FISC Mem.") (Exh. A, hereto).

in fact.  *See Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147-50 (2013); Defs.' MTD at 11-

14.  Plaintiffs' opposition cites no support for their new theory of standing.  They do not allege

any direct injury from the Government's collection from third-party providers of business

records belonging to those providers (and in which Plaintiffs allege no property or other legally

cognizable interest).  And to the extent that they allege injury from the fact that the Government

has simply obtained third-party business records containing metadata previously recorded by

providers about their calls, their theory is cast into doubt by substantial authority.[3]

      Plaintiffs seek to bypass the standing issue by arguing that whether they have suffered a

cognizable invasion of privacy is a question that goes to the merits of their Fourth Amendment

claim, not standing.  Pls.' MTD Opp. at 7 (citing, *inter alia*, *Rakas v. Illinois*, 439 U.S. 128, 139

(1978)).  But even if that were the case,[4] Plaintiffs have no Fourth Amendment privacy interest

---

    [3]  *See, e.g.*, *Horton v. California*, 496 U.S. 128, 142 n.11 (1990) (government's acquisition of an item without examining its contents "does not compromise the interest in preserving the privacy of its contents"); *United States v. Van Leeuwen*, 397 U.S. 249, 252-53 (1970) (defendant's interest in the privacy of his detained first-class mail "was not disturbed or invaded" until the Government searched the packages).  Plaintiffs' new theory of standing is also undercut by *Nat'l Council of La Raza v. Gonzales*, 468 F. Supp. 2d 429 (E.D.N.Y. 2007), *aff'd*, 283 Fed. Appx. 848 (2d Cir. 2008).  In that case, advocacy groups sued to prevent the entry of information about their members' immigration warrants into a law-enforcement database.  The district court dismissed the case for lack of standing because, *inter alia,* although the plaintiffs alleged "that some plaintiff member information either has [been] or will be entered into [the] database," "speculation that at some point in the future some unauthorized party may access [it] in violation of a plaintiff member['s] privacy right does not satisfy the requirement that plaintiffs identify an 'actual or imminent'" injury.  *Id.* at 444.  The Second Circuit affirmed this holding "for substantially the reasons stated by the district court."  283 Fed. Appx. at 851.

    [4]  *Rakas* made it clear that it was not concerned with the "irreducible constitutional minimum" of establishing an injury in fact for federal jurisdiction, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992), but with the "substantive question" whether a person aggrieved by a search or seizure may assert the Fourth Amendment rights of a third party.  439 U.S. at 132-33 & n.2.  Indeed, "the constraints of Article III do not apply to state courts" (like the trial court in *Rakas*), *see ASARCO Inc. v. Kadish*, 490 U.S. 605, 617 (1989), and "[t]he requirement of Article III standing ... ha[s] no bearing upon [a criminal *defendant*'s] capacity to assert defenses" in a prosecution because it is the Government (as plaintiff) whose claims invoke a district court's Article III jurisdiction, *Bond v. United States*, 131 S. Ct. 2355, 2362 (2011).

in third-party business records containing telephony metadata about their calls.  *See Smith v. Maryland*, 442 U.S. 735 (1979); Defs.' MTD at 31-33.  And if they did have a protected Fourth Amendment privacy interest in telephony metadata, that interest would not be infringed if the Government does not examine the data.[5]

Plaintiffs argue alternatively that they have standing because NSA "reviews everyone's records" each time it queries the database – just as if their luggage had been searched – even if a query returns no records of their phone calls.  Pls.' MTD Opp. at 6 & n.2.  That analogy is inapt.  When an individual's luggage is searched, her personal effects are exposed to view and scrutiny by government officials, regardless of whether they include contraband.  In contrast, metadata queries provide NSA analysts with *no* information about the communications in which a subscriber engages unless they fall within one to three "hops" of a targeted terrorist identifier, and so cannot be compared to "an officer's rummaging through the contents of [an individual's] luggage."  *United States v. Place*, 462 U.S. 696, 707 (1983) (canine sniff of luggage is not a search because it "discloses only the presence or absence of narcotics" without "exposing noncontraband items"); s*ee Texas v. Brown*, 460 U.S. 730, 747-49 (1983) (Stevens, J., concurring) (seizure alone of items such as luggage "does not implicate any privacy interests").[6]

---

[5] *See* n.3, *supra*; *see also, e.g.*, *United States v. Clutter*, 674 F.3d 980, 984 (8th Cir. 2012) (seizure of computers, found later to contain child pornography, did not implicate privacy interests at time seizure occurred); *United States v. Licata*, 761 F.2d 537, 541 (9th Cir. 1985) (seizure of a package "affects only the owner's possessory interests and not the privacy interests vested in the contents").   Plaintiffs' attempt to equate metadata queries to thermal-imaging of a home also fails.  Pls.' MTD Opp. at 6 n.2 (citing *Kyllo v. United States*, 533 U.S. 27, (2001)).  *Kyllo* held that thermal imaging constitutes a search because it reveals information regarding the interior of the home.  533 U.S. at 34-35 n.2.  Here, absent queries to which records of Plaintiffs' telephone calls are responsive, the Government learns no information about Plaintiffs' contacts.

[6] *Amidax Trading Gr. v. SWIFT SCRL*, 671 F.3d 140 (2d Cir. 2011), is not to the contrary.  In *Amidax* the plaintiff challenged a program under which the Government, in order to search for persons and institutions associated with terrorism, obtained access to a database of certain financial-transaction records.  *Id.* at 143.  The district court dismissed the suit for lack of

Finally, Plaintiffs miss the point when they argue that they have alleged a "chilling effect on their key contacts and sources" with sufficient "specificity" to confer standing. Pls.' MTD Opp. at 8. The defect in Plaintiffs' allegations is not one of draftsmanship, but of conjecture. Plaintiffs' allegations that unidentified third parties may decide to avoid contacting them because of the telephony metadata program are too speculative, and too dependent on the speculative concerns of third parties, to establish that their injury is "certainly impending" or "fairly traceable" to the Government's conduct, as Article III requires. *See* Defs.' MTD at 13-14; *Amnesty Int'l*, 133 S. Ct. at 1147-50 (speculation insufficient to establish standing); *id.* at 1152 & n.7 (citing *Laird v. Tatum*, 408 U.S. 1, 10-14 (1972)). They have not shown otherwise.

Plaintiffs have not plausibly alleged facts showing an injury sufficient to confer standing.

**POINT II:     PLAINTIFFS' STATUTORY CLAIM IS IMPLIEDLY PRECLUDED**

Plaintiffs' statutory claim—that bulk collection of telephony metadata is unauthorized by Section 215—is impliedly precluded by FISA and the USA PATRIOT Act. *See* Defs.' MTD at 14-19. There is "clear and convincing evidence" in the express language, structure, objectives, and legislative history of those statutes that Congress did not intend for telecommunications subscribers such as Plaintiffs to challenge a Section 215 order in district court. *See Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345, 349 (1984); *NRDC v. Johnson*, 461 F.3d 164, 171 (2d

---

standing, because the plaintiff had not shown that the Government obtained records of its transactions. The Second Circuit affirmed on this basis. *Id.* at 146. The Court of Appeals also quoted the district court's observation that "'[t]o establish an injury in fact . . . [the plaintiff] need only establish that its information was obtained by the government.'" *Id.* at 147 (citation omitted). But that statement was unnecessary to the decision and was therefore *dicta*, because the plaintiff failed to establish that the Government had obtained any records of its transactions. *See Kastigar v. United States*, 406 U.S. 441, 454-55 (1972). The context in which the Court quoted the statement also indicates that it concerned only whether the plaintiff had to show that the Government had acquired the entire database of information as a necessary predicate to establishing his own standing (to which the Court of Appeals answered no). *See* 671 F.3d at 147. Moreover, given the resolution of the case, the Court had no occasion to consider the critical distinction here between obtaining records and examining them, much less repudiate the principles reflected in *Horton*, *La Raza*, and similar cases cited above.

4

Cir. 2006).  Congress specifically authorized challenges to Section 215 production orders only by recipients of those orders—the entities that create and own the records—and permitted those entities to challenge production orders only by filing a challenge in the FISC.  50 U.S.C. § 1861(f)(2)(A)(i), (B).  In order both to ensure meaningful judicial review of production orders and to protect the critical national-security interests that FISA is designed to advance, Congress adopted this process as its chosen method for subjecting FISC orders' compliance with Section 215 to "a substantial and engaging adversarial process."  Aug. 29 FISC Op. at 15.  Were there any doubt that the process was intended to be exclusive, Congress provided expressly that a Section 215 order "shall remain in full effect" unless it has been "explicitly modified or set aside consistent with this subsection."  50 U.S.C. § 1861(f)(2)(D).[7]  The preclusion of Plaintiffs' statutory claim is further demonstrated by 18 U.S.C. § 2712, which creates a damages action against the Government for violations of three specified provisions of FISA, but omits Section 215 from that list, and provides no action for prospective relief.  Defs.' MTD at 17-18.

Plaintiffs' opposition rests on a flawed understanding of Defendants' preclusion argument.  Plaintiffs repeatedly point to the lack of an *explicit* statement by Congress displacing district court actions by third parties such as Plaintiffs.  But the question here is one of implied, not express, preclusion, which requires a close analysis of the structure and purpose of the scheme of judicial review established in FISA.  *See id.* at 14-19; 5 U.S.C. § 702 (withholding consent to suit where another statute "expressly or impliedly forbids" relief); *Cmty. Nutrition Inst.*, 467 U.S. at 345, 349 (finding implied preclusion within the meaning of 5 U.S.C. § 701(a)(1)).  For instance, Plaintiffs argue that Congress did not expressly say, when it enacted

---

[7] Consistent with this evidence of its intent, Congress only gave the Government and recipients rights of appeal in challenges to Section 215 orders, *see id.* §§ 1861(f)(3), 1803(b), and did not expressly authorize motions to suppress evidence obtained through Section 215 orders. *See* Defs.' MTD at 18 n.7.

5

the judicial review procedures for challenging a Section 215 order (50 U.S.C. § 1861(f)), that it was displacing other existing remedies, such as those provided by the APA.  Pls.' MTD Opp. at 22-23.  The point of implied preclusion, however, is to discern that intent from a statute's language, scheme, and legislative history.  *Cmty. Nutrition Inst.*, 467 U.S. at 345, 349.  If an express statement was required, there would be no role for implied preclusion.[8]

Plaintiffs' attempt to avoid the preclusive import of § 1861(f) fails.  *See* Pls.' MTD Opp. at 22-24.  The very legislative history on which Plaintiffs rely shows that by allowing recipients of Section 215 orders to challenge the legality of those orders in the FISC, Congress intended to "place Section 215 proceedings on a par with grand jury proceedings, where the subpoena recipient obviously knows of its existence and can challenge it in court."  *Implementation of the USA PATRIOT Act:  Hearing Before the H. Subcomm. on Crime, Terrorism, and Homeland Security, Comm. on the Judiciary*, 109th Cong. at 65 (2005) (statement of Robert Khuzami).  Congress recognized, however, that allowing a similar right of action by third parties would be incompatible with the secrecy required for Section 215 orders.[9]

---

[8]  Plaintiffs cite *In re Application of the United States*, 830 F. Supp. 2d 114, (E.D. Va. 2011) for the proposition that an express statement of preclusion is necessary, Pls.' Opp. at 25-26, but they overlook the court's *implied* preclusion analysis.  In that case the court found that a provision of the Stored Communications Act, allowing subscribers only to challenge orders requiring service providers to create a backup copy of certain communication contents, implied Congress's intention to prevent other types of challenges.  830 F. Supp. 2d at 128-29.  The court's conclusion was consistent with the statutory scheme, which gives a subscriber whose backup copy is to be provided to the Government special notice of that fact, similar to allowing judicial review for recipients of Section 215 orders, who receive notice of such orders.  *Id.*

[9]  *See id.* ("Beyond this amendment, however, the confidentiality provisions of Section 215 should not be disturbed.  You do not want potential terrorists to know you are investigating them or are aware of their plans.").  *See also* H.R. Rep. No. 109-174 at 128 (right to challenge Section 215 order can only be given to the recipient, not the target, because the target does not know about it); *id.* at 268 (statutory prohibition on disclosing Section 215 order to subject prevents the subject from challenging it).

Congress's intent that third parties should not be able to challenge Section 215 orders even through FISA proceedings cannot be reconciled with the Plaintiffs' position that they should be able to do so in district court.  To promote its effective functioning as a tool for counter-terrorism, Section 215, like other provisions of FISA, establishes a secret and expeditious process that involves only the Government and the recipient of the order.  *See* 50 U.S.C. § 1861(d)(1) (recipient may not "disclose to any other person that the [FBI] has sought or obtained" an order under Section 215).  Under the statutory framework, third parties such as Plaintiffs, who are not recipients of Section 215 orders, are not even supposed to know of their existence, nor play a role in the process of testing their compliance with the statute.  *See, e.g.*, H.R. Rep. No. 109-174 at 128 (2005).  The fact that Plaintiffs learned about the Section 215 order they seek to challenge as the result of an unauthorized and unlawful disclosure does not change this essential facet of FISA's structure.  Allowing third parties to contest an order's compliance with Section 215's relevance and other requirements would potentially compromise the secrecy and efficiency of the process that Congress envisioned.[10]

Plaintiffs' arguments fare no better when it comes to the preclusive effect of 18 U.S.C. § 2712.  They rely on § 2712(d), providing that an action against the United States under § 2712 "shall be the exclusive remedy against the United States for any claims within the purview of this section."  Plaintiffs argue that this language "spell[s] out precisely the preclusive effect of section 2712," Pls.' MTD Opp. at 21, and Defendants agree that this subsection explicitly precludes other suits against the United States for the violations specified in § 2712(a).  But that

---

[10] The fact that third parties are not intended know about Section 215 orders distinguishes the cases Plaintiffs rely upon, in which individuals whose banking records were subpoenaed were permitted to challenge the subpoenas on privacy grounds.  Pls.' MTD Opp. at 24 (citing *Arias-Zeballos v. Tan*, 2007 WL 210112, at *1 (S.D.N.Y. Jan. 25, 2007) (listing cases)).  The individuals challenging the subpoenas were parties to the actions in which the subpoenas were issued and thus had knowledge of them.

7

the statute expressly precludes some claims does not negate the possibility that § 2712(a) reflects Congress's intent to preclude other FISA-based claims not specified in § 2712(a). Here, preclusion of Plaintiffs' suit for prospective relief naturally follows from Congress's decision to provide a remedy for certain misuses of information obtained under the FISA but not for violations of Section 215, and from § 1861(f)(2)(D).[11] As discussed by Congress when it enacted the APA's waiver of immunity, the provision of a particular remedy, such as damages, implies an intent to preclude other remedies, such as injunctive relief. *See* Defs.' MTD at 16.

Plaintiffs cite *Sackett v. EPA*, 132 S. Ct. 1367, 1373 (2012), for the uncontested proposition that "express provision of judicial review in one section of a long and complicated statute" is not "alone enough to overcome the APA's presumption of reviewability." Pls.' MTD Opp. at 22. *Sackett* concerned a statute, the Clean Water Act, that expressly provided for judicial review of *penalties* assessed by the agency, but did not provide for judicial review of *compliance orders* such as the plaintiff (a recipient of such an order) sought to challenge under the APA. 132 S. Ct. at 1373. The Court merely held that it does not necessarily follow that a provision authorizing judicial review of one type of order precludes judicial review of another type of order issued under the same statutory scheme. That principle has no relevance here, where Congress did provide for judicial review of the very type of order Plaintiffs seek to challenge – a Section 215 production order – but limited it to FISC review of challenges brought by recipients of such orders. The preclusion analysis in this case is squarely controlled by the principle that where "a statute provides a detailed mechanism for judicial consideration of particular issues at

---

[11] Contrary to Plaintiffs' suggestion, Defendants have not misread the holding of *Jewel v. NSA*, 2013 WL 3829405 (N.D. Cal. July 23, 2013), "to eliminate injunctive relief under FISA altogether . . . ." Pls.' MTD Opp. at 21 n.10. That is in fact what *Jewel* held: "[T]he issue is whether FISA, by allowing suits against the United States only for damages based on three provisions of that statute, impliedly bans suits against the United States that seek injunctive relief under any provision of FISA. The Court finds that it does." 2013 WL 3829405 at *12.

the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded." *Cmty. Nutrition Inst.*, 467 U.S. at 349.

Plaintiffs also seek to distinguish *Cmty. Nutrition Inst.* by relying on *Ark. Dairy Co-op Assn., Inc. v. USDA*, 573 F.3d 815 (D.C. Cir. 2009).  As Plaintiffs note, both cases involved APA challenges to milk market orders issued pursuant to the Agricultural Marketing Agreement Act ("AMAA").  *Cmty. Nutrition Inst.* held that consumers of milk could not challenge the milk orders because in the complex AMAA scheme, Congress only allowed dairy producers and handlers to participate in the regulatory process, not consumers.  Consistent with that holding, *Ark. Dairy* held that producers, not just handlers, could challenge a milk market order, even though the AMAA did not specifically provide for judicial review by producers.  573 F.3d at 822-23.  Plaintiffs' reliance on *Ark. Dairy* is thus misplaced, because FISA – another complex, technical statutory scheme, *Cmty. Nutrition Inst.*, 467 U.S. at 347 – does not assign persons in their position a role in the Section 215 process.[12]  Indeed, as noted above, the statute's secrecy provisions ordinarily foreclose that possibility.  As another of Plaintiffs' authorities points out, "allowing suit by consumers [under the AMAA] would mean virtually every American could challenge every agricultural marketing order."  *Koretoff v. Vilsack*, 614 F.3d 532, 537 (D.C. Cir. 2010).  Congress did not intend such widespread rights of action under FISA, either.

**POINT III:   THE GOVERNMENT'S BULK COLLECTION OF TELEPHONY METATADA IS AUTHORIZED UNDER SECTION 215**

Plaintiffs' statutory claim should also be dismissed because the Government's bulk collection of telephony metadata falls well within the scope of authority conferred by Section 215.  Defs.' MTD at 19-30.  Plaintiffs' principal contention to the contrary, that bulk telephony

---

[12] That fact also distinguishes this case from *Council for Urological Interests v. Sebelius*, 668 F.3d 704, 710 (D.C. Cir. 2011) (suit by doctor-owned equipment providers was not impliedly precluded by Medicare Act, which contemplated their participation in the Medicare system).  *See* Pls.' MTD Opp. at 24.

metadata are not relevant to authorized counter-terrorism investigations, Pls.' MTD Opp. at 9-15, lacks merit. Section 215 incorporates the same expansive concept of relevance, applicable in grand-jury and other official investigations, that allows for the production of large repositories of information where necessary to locate a much smaller number of records that bear on the subject of the inquiry. *See* Defs.' MTD at 21-23; Aug. 29 FISC Op. at 18-19. Congress adopted this standard of relevance as part of its effort to enhance the Government's ability "to gather information to counter threats to national security." *See* Defs.' MTD at 25-26. Underscoring the Government's "wide latitude" to acquire information under Section 215, Aug. 29 FISC Opp. at 23, the statute requires only a showing of "reasonable grounds to believe" that the records sought are relevant to an authorized investigation. *Id.* at 18; 50 U.S.C. § 1861(b)(2)(A), (c)(1).

The NSA's bulk collection of telephony metadata meets this standard because the collection and aggregation of these data permit the effective use of NSA analytical tools to detect contacts between foreign terrorists and their unknown associates located in the United States who may be planning attacks on the U.S. homeland. *See* Aug. 29 FISC Op. at 20. Absent the creation of an historical repository of information that bulk collection and aggregation of the data allow, it may not be feasible for NSA to identify chains of communications among known and unknown terrorist operatives that cross different time periods and providers' networks. *See id.* at 21-22. Thus, there are reasonable grounds, at the least, for concluding that "the whole of the metadata produced" is "relevant" to authorized national security investigations, *see id.* at 22, a conclusion that Congress ratified by re-enacting Section 215 without change in 2010 and 2011. *Id.* at 23-28; *see also* Oct. 11 FISC Mem. at 3; Defs.' MTD at 26-28.

Plaintiffs fail to show that the FISC lacked a basis for repeatedly reaching this conclusion. They first argue that the cases involving grand jury and administrative subpoenas "preclude[ ] the kind of fishing expedition the government is conducting here." Pls.' MTD Opp.

at 9-11.  But the FISC has not approved a fishing expedition.  Rather, as the FISC has stated,

prior experience "demonstrat[es] that information concerning known and unknown affiliates of

international terrorist organizations [is] contained within the non-content metadata the

government [seeks] to obtain."  Aug. 29 FISC Op. at 20; *see also id.* at 21 ("'[a]nalysts know

that the terrorists' communications are located somewhere' in the metadata").  Accordingly, this

is not a situation where the Government is casting about for evidence of "other wrongdoing, as

yet unknown," *In re Sealed Case*, 42 F.3d 1412, 1418 (D.C. Cir. 1994), or where "there is no

likelihood that useful evidence might be uncovered," *In re Fontaine*, 402 F. Supp. 1219, 1221

(E.D.N.Y. 1975).  *See* Pls.' MTD Opp. at 11, 13.[13]  Nothing in the cases cited by Plaintiffs

"precludes" the FISC from finding that bulk telephony metadata are relevant to authorized

counter-terrorism investigations.[14]

     Plaintiffs next argue that the Government's theory of relevance, repeatedly endorsed by

the FISC, "has no foundation in the text of Section 215."  Pls.' MTD Opp. at 11.  But the statute

assigns no meaning to the term "relevant" other than its commonly accepted understanding,

which is more than sufficiently expansive to accommodate the bulk production of telephony

---

[13] Notably, Plaintiffs rely heavily on cases involving trial subpoenas issued under Fed. R. Crim. P. 17(c), which is "not intended to provide a means of discovery for criminal cases." *United States v. Nixon*, 418 U.S. 683, 698-99 (1974), citing *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220-21 (1951).  These cases shed no light on the concept of relevance applied to grand-jury and administrative subpoenas that informs the scope of Section 215.

[14] Plaintiffs attempt to distinguish the cases, cited by Defendants, illustrating that courts will compel production of large repositories of records that are reasonably likely to yield information bearing on the subject of an official investigation, even where the chances are small that any given record will bear directly on the subject of the investigation. Pls.' MTD Opp. at 9; *see* Defs.' MTD at 22 & nn.9-10. The principle of these decisions cannot be dismissed as Plaintiffs suggest, however, for they show that the concept of relevance applied in the investigatory context is too "variable in relation to the nature, purposes, and scope of [an] inquiry," *Okla. Press Pub. Co. v. Walling*, 327 U.S. 186, 209 (1946), to preclude the FISC's findings of relevance as unreasonable.

metadata on the grounds the FISC has accepted.  It is Plaintiffs' burden, therefore, to show why

the text of Section 215 prohibits a finding of relevance on that basis.  They have not done so.

First Plaintiffs suggest that Section 215's relevance requirement is "significantly

narrower" than that applied in the grand-jury context.  *Id.* at 12.  But the statute's terms

("reasonable grounds to believe" that the records sought are relevant) are highly comparable to

the relevance standard applicable to grand-jury subpoenas ("reasonable possibility" that the

materials requested will produce relevant information, *United States v. R. Enters., Inc.*, 498 U.S.

292, 301 (1991)).  Moreover, the legislative history confirms that Congress intended relevance

under Section 215 to be at least as broad as that "well established standard" of relevance, *see*

Defs.' MTD at 23 & n.12, not "significantly narrower."[15]  Plaintiffs also observe that Section

215 limits the type of investigations to which it applies, and the types of tangible items whose

production can be compelled.  *See* Pls.' MTD Opp. at 12, 13; 18 U.S.C. § 1861(b)(2)(A),

(c)(2)(D).  But these provisions say nothing about the nature and scope of "relevant" items the

Government can seek to obtain when (as here) their terms are met.  Nothing in the "plain text" of

Section 215, Pls.' MTD Opp. at 13, undermines the FISC's repeated conclusion that bulk

telephony metadata are relevant to authorized counter-terrorism investigations.

Plaintiffs also fail to undercut the conclusion that Congress implicitly ratified the

Government's (and the FISC's) construction of Section 215 when it re-enacted the statute in both

---

[15] Plaintiffs' related contention, that Congress meant to impose "a *higher* standard for the
acquisition of records" under Section 215 when it incorporated the express relevance standard,
Pls.' MTD Opp. at 12 n.7, is also refuted by the legislative history.  H.R. Rep. No. 109-174, pt.
2, at 6 (codification of relevance standard "is intended to clarify the original intention" of Section
215 "and is not intended to 'raise' the standard for" Section 215 orders); S. Rep. No. 109-85 at
15 ("the Committee has clarified that 'relevance' to an authorized investigation is the correct
standard for issuing" an order under Section 215, "as opposed to the current, *equivalent* standard,
'for an investigation'") (emphasis added); H.R. Conf. Rep. No. 109-333 at 91 ("Congress does
not intend" by codifying an express relevance standard "to prevent the [Government] from
obtaining tangible items that it currently can obtain under section 215").

2010 and 2011.  *See* Defs.' MTD at 26-28; Aug. 29 FISC Op. at 23-27.  Plaintiffs err when they

suggest that the doctrine of Congressional ratification applies only when individual Members of

Congress are actually aware of the Executive's interpretation of the law.  Pls.' MTD Opp. at 17-

18.  As the Supreme Court stated plainly (and recently) in *Forest Grove Sch. Dist. v. T.A.*,

"'Congress is presumed to be aware of an administrative or judicial interpretation of a statute and

to adopt that interpretation when it re-enacts a statute without change,'" 557 U.S. 230, 239-40

(2009) (citation omitted); *see also* Aug. 29 FISC Op. at 23.  That presumption applies here,

notwithstanding the secrecy that surrounded the telephony metadata program at the time, because

prior to the 2010 and 2011 re-enactments of Section 215, the Executive Branch provided briefing

papers to Congress that included "extensive and detailed information . . . regarding the nature

and scope" of the program.  Aug. 29 FISC Op. at 25 & n.23; *see* Oct. 11 FISC Mem. at 3; Defs.'

MTD at 26-27.[16]  The FISC correctly concluded that this record of actual and repeated notice to

Congress of the Executive's (and the FISC's) interpretation of Section 215 more than amply

supports application of the re-enactment doctrine as a further ground for finding that bulk

telephony metadata meet the statute's relevance requirement.  *Id.* at 27.[17]

---

[16]  The House and Senate Intelligence Committees made the first briefing paper available
for inspection by all Members of Congress prior to the re-enactment of Section 215 in 2010; the
second paper was made available for inspection by all Members of the Senate prior to the vote in
2011.  *See* Defs.' MTD at 27 n.15; Aug. 29 FISC Op. at 26, 27 & n.25.  Plaintiffs observe that an
unspecified number of Representatives elected in November 2010 reportedly were not given
access to the second briefing paper, Pls.' MTD Opp. at 18, citing Peter Wallsten, *House Panel
Withheld Document on NSA Surveillance Program from Members*, Wash. Post, Aug. 16, 2013,
*available at* http://wapo.st/lcTBZmh, but they neglect to mention that, according to the same
article, the House Intelligence Committee held classified briefings on the telephony metadata
program in 2011, to which it invited all 435 House Members.

[17] *See EEOC v. Shell Oil Co.*, 466 U.S. 54, 69 & n.21 (1984), *and Haig v. Agee*, 453 U.S.
280, 297-98 & n.37 (1981) (both finding "clear[ ]" and "undoubted" Congressional awareness of
the pertinent judicial and executive interpretations, based on references in committee reports).

Little heed should be given to Plaintiffs' suggestions, *inter alia,* that compelled nationwide DNA sampling, and daily collection of financial-transaction records from every commercial enterprise in the nation, will result if bulk telephony metadata can be collected under Section 215.  Pls.' MTD Opp. at 11, 14.  Precisely because the concept of relevance is so inherently "variable in relation to the nature, purposes, and scope of [an] inquiry," *Oklahoma Press*, 327 U.S. at 209, a decision here that bulk telephony metadata are relevant, as a whole, to counter-terrorism investigations in no way foretells, much less compels, the decision the FISC would reach were the Government to seek an order directing bulk production of other records. The result in any such case would depend, at the least, on the nature of the records in question, the bearing they have on the Government's investigations, the scope of the production sought, and any constitutional considerations, none of which can be predicted or assessed in the abstract. Plaintiffs' theories of excess supply no valid basis for this Court to second-guess the relevance determinations that the FISC has consistently made for the past seven years.

Plaintiffs' final argument, that Defendants' construction of Section 215 is "impossible to reconcile with the larger statutory scheme," Pls.' MTD Opp. at 15-17, largely reprises meritless arguments that Defendants have already addressed, *see* Defs.' PI Opp. at 23-24, and discuss here only as needed.  In support of their contention that Section 215 does not permit orders compelling production of call-detail records on a prospective basis, Plaintiffs state that most courts have so held under the Stored Communications Act (SCA), but they misunderstand the cases they cite.  Pls.' MTD Opp. at 16.  Those cases typically involved law-enforcement requests for cell-site location information (CSLI) data that the courts feared could be used as "tracking information" in violation of other federal law.  *See, e.g.*, *In re Application for Pen Register and Trap/Trace Device*, 396 F. Supp. 2d 747, 755-56 (S.D. Tex. 2005).  In other cases where the Government sought limited CSLI data that courts did not construe as tracking information, they

have held that the SCA authorizes prospective court orders for non-CSLI metadata, because nothing in the text or legislative history of the statute (or other law) prohibits them.  *See* Defs.' PI Opp. at 23 & n.12.  So, too, with Section 215.  Plaintiffs also argue for the first time that the SCA *directly* prohibits disclosure of telephony metadata to the Government under Section 215, Pls.' MTD Opp. at 15, but Section 215 allows the Government to obtain "any tangible things," without restriction.  *See United States v. Gonzales*, 520 U.S. 1, 5 (1997).  Notably, the argument now advanced by Plaintiffs was considered and rejected by the FISC in 2008, as contrary to the objective of a coherent and harmonious legislative scheme.  *In re Prod. of Tangible Things From [Redacted]*, Dkt. No. BR 08-13, Supp. Op. 4-5 (F.I.S.C. Dec. 12, 2008) (Exh. B, hereto).

**POINT IV:   THE GOVERNMENT'S COLLECTION OF TELEPHONY METADATA DOES NOT VIOLATE PLAINTIFFS' FOURTH AMENDMENT RIGHTS**

Plaintiffs' opposition to Defendants' motion to dismiss largely repeats arguments in support of their Fourth Amendment claim set forth in their motion for a preliminary injunction. In opposition to that motion, Defendants showed why *Smith v. Maryland*, 442 U.S. 735 (1979), and its progeny compel the conclusion that the collection of telephony metadata does not constitute a search under the Fourth Amendment, and why *United States* v. *Jones*, 132 S. Ct. 945 (2012), does not support Plaintiffs' theory.  Plaintiffs have identified no meaningful distinction between the type of information at issue in *Smith* – numeric telephone numbers – and the telecommunications business records at issue here.  Nor does the breadth of the challenged program distinguish *Smith* in light of the personal nature of Fourth Amendment rights.  Defs.' PI Opp. at 24-30; *see also* Oct. 11 FISC Mem. at 4-5.

Furthermore, even if the Court agreed with Plaintiffs and concluded that the program constitutes a search, there is no support for Plaintiffs' characterization of the FISC's orders as "general warrant[s] for the digital age."  Rather, any search here would be entirely reasonable in light of the Government's compelling interest in preventing terrorist attacks; the stringent

statutory and court-imposed safeguards that limit the use, retention, and dissemination of the records collected; and the negligible intrusion on individual privacy caused by the collection of telephony metadata devoid of any subscriber identifying information.  Defs.' MTD at 31-33.  *See also id.* at 35 (explaining that the government's interests are weighed against the intrusion on privacy to assess suspicionless searches that serve special government needs).

Defendants therefore focus here on Plaintiffs' new argument, to wit (assuming, *contra Smith*, that they have a reasonable expectation of privacy in metadata business records created by third-parties), the Supreme Court's special-needs analysis is inapplicable here, and that the warrant and probable-cause requirements apply instead.  In particular, Plaintiffs argue that special-needs analysis applies only where the primary purpose of the government's action is "above and beyond criminal law enforcement," and where the special needs make the warrant and probable cause requirements "impracticable."  Pls.' MTD Opp. at 30.  But even accepting those propositions *arguendo*, both requirements are met here.  First, the undisputed purpose of the telephony metadata program is identifying unknown terrorist operatives and preventing terrorist attacks—forward-looking goals that fundamentally differ from ordinary criminal law enforcement, which focuses on solving crimes that have already occurred, not protecting public safety and national security.  The Supreme Court has distinguished between domestic-security surveillance and surveillance in connection with ordinary crime:

> The gathering of security intelligence is often long range and involves the interrelation of various sources and types of information.  The exact targets of such surveillance may be more difficult to identify than in surveillance operations against many types of crime . . . .  Often, too, the emphasis of domestic intelligence gathering is on the prevention of unlawful activity or the enhancement of the Government's preparedness for some possible future crisis or emergency.  Thus, the focus of domestic surveillance may be less precise than that directed against more conventional types of crime.

*United States v. U.S. Dist. Court (Keith)*, 407 U.S. 297, 322-23 (1972).  *See also Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 U.S. 822, 828 (2002) (the probable

cause standard "is peculiarly related to criminal investigations and may be unsuited to

determining the reasonableness of administrative searches where the Government seeks to

*prevent* the development of hazardous conditions.") (internal quotations omitted); *United States

v. Abu-Jihaad*, 630 F.3d 102, 122 (2d Cir. 2010) (extending the distinction noted in *Keith* to

foreign intelligence surveillance); *MacWade v. Kelly*, 460 F.3d 260, 271 (2d Cir. 2006)

("[P]reventing a terrorist from bombing the subways constitutes a special need that is distinct

from ordinary post hoc criminal investigation.").[18]

Second, requiring individualized suspicion here would indeed be impracticable.  The

Government's interests in identifying unknown terrorist operatives and preventing terrorist

attacks are great and cannot be as effectively achieved by requiring individualized suspicion to

collect telephony metadata because such a requirement would not permit the type of historical

analysis and contact chaining that the broader collection enables.  *See* Aug. 29 FISC Op. at 20-

22; Defs.' PI Opp. at 32-33.  Thus, given that the program might be entirely infeasible without

the collection, it would certainly be "impracticable" to require individualized suspicion in this

context.  *See Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665-66 (1989).

Moreover, the individual interests on the other side of the Fourth Amendment balance do

not outweigh the government's substantial counterterrorism objectives.  As the Supreme Court

has explained, "where a Fourth Amendment intrusion serves special governmental needs, beyond

the normal need for law enforcement, it is necessary to balance the individual's privacy

expectations against the Government's interests to determine whether it is impractical to require

---

[18]   While neither Section 215 nor the FISC's orders require probable cause or
individualized suspicion, and are therefore not Fourth Amendment "warrants," the telephony
metadata program was authorized by neutral and detached FISC judges (by now, fifteen FISC
judges, thirty-five separate times).  *See In re Sealed Case*, 310 F.3d 717, 738, 742 (F.I.S.C.R.
2002) (approval by FISC under the statutory standards, even if not meeting Fourth Amendment
requirements for a warrant, bears on reasonableness under the Fourth Amendment).

a warrant or some level of individualized suspicion in the particular context." *Id.* at 665-66. More specifically, the scope of the legitimate expectation of privacy and the character of the intrusion are balanced against the nature of the government interests to be furthered, as well as the immediacy of the government's concerns regarding those interests and the efficacy of the policy at issue in addressing those concerns. *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 658, 660, 662-63 (1995). Here, the privacy interests in telephony metadata that can only be used for counter-terrorism purposes under strictly controlled circumstances are minimal. *See* Defs.' MTD at 36; Defs.' PI Opp. at 31-32. Plaintiffs' claim that there is no diminished expectation of privacy is squarely contrary to the Supreme Court's conclusion that there is no reasonable expectation of privacy in telephony metadata. *Smith*, 442 U.S. at 741-46. Indeed, unlike the DNA samples at issue in *Maryland v. King*, 133 S. Ct. 1958 (2013), which were collected to create DNA fingerprints that "revealed nothing more than the individuals' identities," Pls.' MTD Opp. at 35, the telephony metadata collected by the Government do not even reveal the individuals' identities.

Thus, even if Plaintiffs had a reasonable expectation of privacy in telephony metadata, which they do not, the NSA's acquisition of these data is reasonable and does not violate Plaintiffs' Fourth Amendment rights.

**POINT V:    PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED THAT THE TELEPHONY METADATA COLLECTION PROGRAM VIOLATES THE FIRST AMENDMENT**

Plaintiffs' First Amendment arguments also require little in the way of response. First, in straw-man fashion, Plaintiffs assign to Defendants the position that First Amendment protections "vanish" whenever government investigations implicate the Fourth Amendment. *See* Pls.' MTD Opp. at 35-37. Defendants, however, make no such argument. Instead, Defendants have consistently explained that good-faith governmental investigations conducted in observance of

Fourth Amendment requirements do not violate the First Amendment *so long as* they are not pursued with a purpose to deter or penalize protected expression or association.  *See* Defs.' MTD at 37-40 (collecting cases); Defs.' PI Opp. at 33.[19]  Plaintiffs do not even purport to allege that the telephony metadata program is conducted for any reason other than legitimate purposes of counter-terrorism.  Instead they observe that Fourth Amendment requirements must be followed with "scrupulous exactitude" where an investigation implicates First Amendment interests, *see Stanford v. Texas*, 379 U.S. 476, 485 (1965) (applying "scrupulous exactitude" under the Fourth Amendment where "the 'things to be seized' . . . are books, and the basis for their seizure is the ideas which they contain").  As Defendants have already explained, however, the Fourth Amendment imposes no restrictions on the Government's collection of non-content telephony metadata, and even if it did, its requirement of reasonableness is satisfied here.  *See supra* Point IV; Defs.' MTD at 31-37.  Plaintiffs have therefore failed to state a First Amendment claim.

Second, Plaintiffs insist that it is irrelevant, as a First Amendment matter, whether the telephony metadata program constitutes a direct or indirect burden on associational activities.  Pls.' MTD Opp. at 39-40.  But this argument is yet another straw man, as Plaintiffs fail to plausibly allege that the program imposes a "substantial" burden on their associational rights – a prerequisite for the scrutiny they ask this Court to apply.  *See Tabbaa v. Chertoff*, 509 F.3d 89,

---

[19]  Plaintiffs note that in *Reporters Comm. for Freedom of the Press v. AT&T Co.* Judge Robinson found it unnecessary to join the sub-section of Judge Wilkey's opinion concluding that compliance with Fourth-Amendment standards satisfies First Amendment concerns in the context of good-faith investigations, *see* 593 F.2d 1030, 1054-60 (D.C. Cir. 1978), but nonetheless neglect to mention that Judge Robinson "join[ed] unreservedly" Judge Wilkey's core holding that "the freedom to gather information guaranteed by the First Amendment is . . . subject to the general and incidental burdens that arise from good faith enforcement of otherwise valid criminal and civil laws that are not themselves solely directed at curtailing the free flow of information. . . . Thus, the Government's good faith inspection of defendant telephone companies' toll call records does not infringe on plaintiffs' First Amendment rights, because that Amendment guarantees no freedom from such investigation."  *Id.* at 1051-52.  Nothing in *Clark v. Library of Congress*, 750 F.2d 89 (D.C. Cir. 1984), supersedes this holding.  Indeed, *Clark* did not involve a Fourth Amendment claim, or even mention *Reporters Committee*.

101 (2d Cir. 2007) (in order for "exacting scrutiny" to apply, "the interference with [plaintiffs']

associational rights must be 'direct and substantial' or 'significant'") (quoting *Fighting Finest,*

*Inc. v. Bratton*, 95 F.3d 224, 228 (2d Cir. 1996)); *see also Lyng v. UAW*, 485 U.S. 360, 366, 367

& n.5 (1988).  The very authorities cited by Plaintiffs underscore the shortcoming of their

position, as Defendants have previously explained.  *See* Defs.' PI Opp. at 35-37.  Furthermore,

the FISC orders authorizing the program are not targeted at Plaintiffs, based on their

associational activities or otherwise; do not compel Plaintiffs or anyone else to disclose the

names or addresses of Plaintiffs' members, their clients, or anyone else with whom they

associate; do not allow the Government to scrutinize their contacts indiscriminately; and have no

alleged purpose other than the concededly compelling interest of identifying terrorist operatives

and preventing terrorist attacks.  The allegation that the Government's collection of non-content

metadata may have an incidental effect on Plaintiffs' associational interests fails to meet the

"'direct and substantial' or 'significant'" threshold required by the Supreme Court and Second

Circuit for application of "exacting scrutiny."  *See id.* at 33-37.  Plaintiffs' First Amendment

claim should be dismissed.

## **CONCLUSION**

For the reasons stated above and in Defendants' memorandum in support of their motion

to dismiss, the Complaint should be dismissed.

20

Dated:  New York, New York
            October 25, 2013

STUART F. DELERY                          PREET BHARARA
Assistant Attorney General                United States Attorney for the
                                          Southern District of New York
JOSEPH H. HUNT                            Attorney for Defendants
Director

ANTHONY J. COPPOLINO                 By:   /s/ David S. Jones
Deputy Director                           DAVID S. JONES
                                          TARA M. La MORTE
By:   /s/ James Gilligan                  JOHN D. CLOPPER
      JAMES J. GILLIGAN                   CHRISTOPHER HARWOOD
      Special Litigation Counsel          Assistant United States Attorneys
      MARCIA BERMAN                       86 Chambers Street, 3rd Floor
      Senior Trial Counsel                New York, New York 10007
      BRYAN DEARINGER                     Tel. (212) 637-2739/2746/2716/2728
      RODNEY PATTON                       Fax (212) 637-2730
      Trial Attorneys                     david.jones6@usdoj.gov
      Civil Division                      tara.lamorte2@usdoj.gov
      Federal Programs Branch             john.clopper@usdoj.gov
      U.S. Department of Justice          christopher.harwood@usdoj.gov
      20 Massachusetts Ave., N.W.
      Washington, DC  20001
      Tel.: (202) 514-3358