DBM8AMEA

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   AMERICAN CIVIL LIBERTIES UNION,
    et al.,
4
                    Plaintiffs,
5
            v.                          13 Cv. 3994 (WHP)
6
    JAMES R. CLAPPER, et al.,
7
                    Defendants.
8
    ------------------------------x
9
                                    November 22, 2013
10                                  10:30 a.m.

11  Before:

12                  HON. WILLIAM H. PAULEY III

13                                  District Judge

14                      APPEARANCES

15  AMERICAN CIVIL LIBERTIES UNION FOUNDATION
    BY:  JAMEEL JAFFER
16       ALEXANDER A. ABDO
         PATRICK C. TOOMEY
17       BRETT M. KAUFMAN

18  ERIC T. SCHNEIDERMAN
         Attorney General of the State of New York
19  BY:  STUART F. DELERY
         Assistant Attorney General
20
    U.S. DEPARTMENT OF JUSTICE
21  BY:  MARCIA BERMAN
         JAMES J. GILLIGAN
22       BRYAN DEARINGER

23

24

25

DBM8AMEA

1                       APPEARANCES (CONT'D)

2   PREET BHARARA
         United States Attorney for the
3        Southern District of New York
    DAVID S. JONES
4   JOHN D. CLOPPER
         Assistant United States Attorneys
5
    CHAD BAYSE
6   SCOTT CHUTKA
         Agency Counsel, NSA
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DBM8AMEA

```
1        (Case called)

2            THE DEPUTY CLERK:  Appearances for the plaintiff.

3            MR. JAFFER:  Jameel Jaffer, Alex Abdo, Patrick Toomey,

4    and Brett Kaufman for the plaintiffs.

5            THE COURT:  Good morning.

6            THE DEPUTY CLERK:  Appearance for the defendants.

7            MR. JONES:  David Jones from the U.S. Attorney's

8    Office for the Southern District of New York.  This is John

9    Clopper, my colleague here in the Southern District, three

10   attorneys from the Justice Department in Washington, who will

11   not be arguing, Bryan Dearinger, Marcia Berman and Jim

12   Gilligan, and arguing for the government is Stuart Delery, who

13   is also from the Justice Department in Washington.

14           THE COURT:  Good morning.

15           This is oral argument, both on the ACLU's motion for a

16   preliminary injunction and the government's motion to dismiss.

17   I propose to conduct the argument in the following manner.  I

18   will hear first from the ACLU and then from the Department of

19   Justice on your principal arguments for approximately 30

20   minutes each, and then I will give each of you an opportunity

21   to respond to what you have heard from your adversary.  And, of

22   course, I will allow some flexibility in that, but that's my

23   general intention.

24           So with that in mind, do you want to be heard, Mr.

25   Jaffer?
```

DBM8AMEA

1          MR. JAFFER:  Yes, please, your Honor.

2          Your Honor, I am going to address our statutory claims

3     and my colleague Alex Abdo is going to address our

4     constitutional claims.  There are some issues that relate to

5     both sets of claims, and we are both prepared to address those.

6          As you know, this case involves a challenge to the

7     NSA's collection of data about virtually every telephone call

8     made or received on U.S. networks.  This vast dragnet is said

9     to be authorized by Section 215 of the USA Patriot Act, but

10    nothing in the text or legislative history of that provision

11    remotely suggests that Congress intended to empower the

12    government to collect information on a daily basis,

13    indefinitely, about every American's phone calls.

14          The language of Section 215 is broad, but it's similar

15    or identical to the language used in other authorities, and

16    none of those authorities has been interpreted as the

17    government interprets Section 215 here.

18          Moreover, Section 215 is part of a larger statutory

19    scheme that reflects a sensitivity to the intrusive power of

20    technology and a respect for individual privacy.  If there were

21    any doubt about the reach of the provisions of the doctrine of

22    constitutional avoidance counsels against interpreting it as

23    the government interpreted here, that is in a way that would

24    raise substantial constitutional questions.

25          So I would like to address three questions.  The first

DBM8AMEA

1   is the Court's jurisdiction to hear the case, the second is

2   whether the program exceeds statutory authority, and the third

3   is whether plaintiffs' claim is precluded either by 18 U.S.C.,

4   Section 2712 or by Section 215 itself.  But, of course, if you

5   have questions on any other issue, I am happy to address those

6   too.

7          On the jurisdictional question, your Honor, we think

8   that this issue is pretty straightforward.  The Court has

9   subject matter jurisdiction under the federal question statute

10  and the Administrative Procedure Act.  To the extent the

11  question that the Court asked at the original status conference

12  in this case was a question about prudential considerations,

13  our view is that all prudential considerations weigh in favor

14  here of the exercise of the Court's jurisdiction.  I am

15  thinking of three things in particular.

16         The first is that plaintiffs can't bring these claims

17  in any other court.  The FISA court, as you know, is a court of

18  limited jurisdiction, a specialized court that deals only with

19  the government's applications for surveillance.  There is a

20  statutory provision, 50 U.S.C. 1803, that sets out that

21  jurisdiction.  This is not the kind of case that we can bring

22  in the FISA court and the government agrees with that.

23         The second is that the government has conceded that

24  this Court is the proper venue for these claims.  In fact, in

25  *In re EPIC*, the government asked the Supreme Court to dismiss a

DBM8AMEA

1  mandamus petition that had been filed directly in that court on

2  the grounds that petitioner in that case should have done

3  precisely what the ACLU has done here, file an action in an

4  ordinary district court.  And I will just read you one sentence

5  from the government's brief in that case.  The government

6  wrote, "The proper way for petitioner to challenge the

7  telephony records program is to file an action in federal

8  district court, as other parties have done."

9          Then, finally, your Honor, there is nothing unusual or

10  inappropriate about a district court evaluating the lawfulness

11  of a FISA court order.  It happens routinely in criminal cases.

12  When defendants move to suppress evidence obtained under FISA,

13  the question that courts ask is, was the surveillance lawful?

14  And in effect the court is assessing the original FISA court

15  order.

16          So for all those reasons, we think that there is no

17  question that the Court has jurisdiction here, and to the

18  extent the prudential consideration should be factored in, all

19  of them weigh in favor of the exercise of the Court's

20  jurisdiction.

21          I will go on to the scope of the statute.

22          On the question of whether the program is authorized

23  by Section 215, I think I think I would like to focus on three

24  things, unless your Honor feels that the focusing on one of

25  them is unnecessary.

DBM8AMEA

1          The first is whether Section 215 can lawfully be used

2     to collect call records at all.  The second is whether, even if

3     Section 215 can be used to collect call records, it can be used

4     to engage in collection on this scale.  Then, finally, the

5     question whether Congress ratified the call tracking program

6     when it reauthorized Section 215 in 2010 and 2011.

7          As we explained in our briefs, your Honor, and I will

8     try not to repeat what we have said in our briefs, but just

9     highlight a few points, Section 215 can't lawfully be used to

10    obtain call records at all.  That's because at the same time

11    that Congress enacted Section 215 in 2001, in fact, in the very

12    same bill, it added a separate provision to the Stored

13    Communications Act that specifically prohibits the disclosure

14    of call records.  Now, there are exceptions to that rule, but

15    those exceptions don't include Section 215.

16          The government's argument, as I understand it, is that

17    Section 215 constitutes an implicit exception to that privacy

18    rule set out in 18-2702.  That argument is unpersuasive for

19    several reasons.

20          First, it's a well accepted canon of statutory

21    interpretation that the inclusion of some things implies the

22    exclusion of others.  In its list of exceptions to 2702,

23    Congress included some authorities, but it excluded others, and

24    the Court should give significance to that decision.

25          THE COURT:  What about the language in Section 215

DBM8AMEA

1    stating that, "Any production or nondisclosure order not

2    explicitly modified or set aside consistent with this

3    subsection shall remain in full effect"?

4          MR. JAFFER:  Two things about that.  First, we are not

5    asking this court to set aside the Section 215 order.  This is

6    a challenge to executive conduct, not a request that the Court

7    review the 215 order.  And that's a distinction I think that

8    the government makes quite well in its response in the *In re*

9    *EPIC* decision.

10          The second thing is the legislative history makes

11   clear that the purpose of that particular provision was to

12   ensure that if a provider brought a challenge to a Section 215

13   order, while the issues were going up through the FISA court of

14   review and then eventually possibly to the Supreme Court, the

15   Section 215 order would remain valid.  That was the point of

16   that provision.  It was not meant to be this grand preclusive

17   provision in the way that the government suggests it is.  There

18   is no suggestion of that in the legislative history.

19          THE COURT:  If this Court were to enjoin the metadata

20   collection, wouldn't that be an order not modified or set aside

21   consistent with Section 215?

22          MR. JAFFER:  I don't think so.  I think the order we

23   are asking you to issue is an order that goes only to executive

24   officials.  It restricts what they can do.  It would create a

25   an obvious tension with the Section 215 order, but the Section

DBM8AMEA

1    215 order would not be set aside.  It would remain valid and

2    that provision would not be implicated at all in our view, your

3    Honor.  And again, I think that's consistent with the

4    legislative history.

5          But I think your question goes to preclusion, and I

6    would like to, if your Honor doesn't mind, just first set out

7    our view of the scope of the statute and why, assuming our

8    statutory claims aren't precluded, why we think that this

9    program violates Section 215.

10         As I already said, the privacy rule sets out

11   exceptions.  215 is on one of them.  In our view, the Court

12   should give significance to the distinction that Congress drew.

13   But the other thing is that the government has itself

14   recognized that reading in implied exceptions to the privacy

15   rule set out in 2702 is inappropriate.  And we go through some

16   examples on page 5 of our reply brief, which I won't recite

17   here, three different examples in which the government itself

18   concluded that reading in the kind of implied exception that

19   it's asking the Court to read in here would be inappropriate.

20         Then, finally, your Honor, a third prong of the

21   government's argument that Section 215 constitutes an implicit

22   exception to 2702 is that Section 215 lacks the

23   "notwithstanding any other provision" language that appears in

24   every other provision of FISA.

25         Now, the only authority that the government relies on

DBM8AMEA

here for the proposition that Section 215 constitutes an

implicit exception is Judge Walton's opinion from December of

2008.  I am not sure that this is entirely clear from the

briefs, but the program was launched several years before this,

and my understanding is at some point it came to the

government's attention that they had overlooked a statute when

they first briefed this to the court, and to their credit they

went to the court and said, it turns out that there is this

statute that on its face forecloses us from collecting call

records under Section 215.  We believe there is a way to read

Section 215 to allow us to do what we are doing.  And three

years after the program was first launched, Judge Walton was

asked to address this question.

        Obviously, it was not an adversarial process.  The

arguments we are making to this Court were not made to that

court, and certainly they weren't made by anyone who had an

incentive to make them forcefully and persuasively.  And we

think Judge Walton's opinion is wrongly decided.  We think that

he got this particular issue wrong.  The sort of pivotal point

in Judge Walton's opinion is the theory that Congress would not

have wanted to foreclose the government from obtaining call

records through a Section 215 order, which requires court

review at the outset, when it authorized the government to

obtain call records under Section 2709, the national security

letter provision, which doesn't require court review at the

DBM8AMEA

1    outset.

2              But there are actually many good reasons why Congress

3    might have wanted the government to use 2709 rather than

4    Section 215 to collect call records.  I will just identify two

5    of them.  We identify others in the brief.  One of them is that

6    Section 2709 places limits on the kind of call records that the

7    government can obtain.  And if you allow the government to use

8    Section 215 to obtain call records, then the government

9    essentially has an end run around the limits in 2709.

10             This is something that we don't say in our brief, but

11   2709 also restricts the kinds of investigations in which the

12   government can obtain call records.  It says that the

13   government can obtain call records in counterterrorism

14   investigations and in clandestine intelligence investigations,

15   but not in foreign intelligence investigations.  Foreign

16   intelligence investigations are a sufficient basis for Section

17   215 orders, but not for national security letters.  So there

18   are all sorts of reasons why Congress would have wanted the

19   government to proceed under the NSL statute rather than under

20   215, and Judge Walton, respectfully, overlooked those reasons.

21             Now, ultimately, your Honor, I don't think it's

22   necessary to get into this inquiry about what Congress

23   intended.  The statute is clear on its face, and I think that

24   that should end the analysis.

25             So that's our first argument on the scope of the

DBM8AMEA

1    statute.  The one other argument which I thought I should

2    highlight is just that even if the government can obtain call

3    records under this statute, nothing permits it to obtain call

4    records on the scale that it's obtaining them.

5         Your Honor, the statute, as you know, imposes two

6    limits on the scope of the government's authority here.  One is

7    set out in 1861(b)(2)(A), which includes the language relating

8    to relevance, reasonable grounds to believe that the tangible

9    things are relevant.  And the other is set out in (c)(2)(D),

10   which states that the government can't obtain anything that

11   can't be obtained by a grand jury subpoena or administrative

12   subpoena or another court order.

13        So those are two distinct limits.  But before I sort

14   of dive into the weeds of those limits, I just want to note

15   that the big problem with the government's theory is that it is

16   absolutely without limit.  And when I say that, I am thinking

17   of three things.  First, if the government can engage in

18   collection on this scale under Section 215, there is no reason

19   why it couldn't do so under many other authorities.  As I said

20   earlier, the same language that's used in Section 215, or

21   language very similar to it, is used in many other authorities.

22   So if the government can collect all call records under Section

23   215, why couldn't it collect all call records with a grand jury

24   subpoena or an administrative subpoena or a national security

25   letter?

DBM8AMEA

1          THE COURT:  What is the proper unit to be considered

2     in determining relevance?  Is it a single customer's records?

3          MR. JAFFER:  I am not sure it would make a difference

4     to the outcome in this case given how much information they are

5     obtaining about every single person.  But ultimately here, the

6     court order that the government is relying on, or the argument

7     that the government made to the FISA court, is that all

8     American's call records are relevant.  So I think that's the

9     relevant unit.  That is what the government is seeking.  The

10    question is, are all of those records relevant?

11         Now, I don't know if this is what you're getting at,

12    your Honor, but the language in (b)(2)(A) uses the phrase "are

13    relevant."  I am not saying that every single record that the

14    government obtains under Section 215 either has to relate to a

15    suspected terrorist or it's not relevant.  I am not making that

16    argument.  But I do think that it's worth noting that the

17    language in (b)(2)(A) is, if anything, narrower than the

18    language that the courts have used in a grand jury or

19    administrative subpoena.

20         THE COURT:  When the Congress added the word relevant

21    in 2006, did it intend to raise the necessary showing?

22         MR. JAFFER:  I think it did, your Honor.  The language

23    before 2006 obviously didn't include a relevance requirement.

24    To be frank, the legislative history is mixed on this point.

25         THE COURT:  That's nothing new, right?

1              MR. JAFFER:  No, it's nothing new.

2              So I am not sure how much we can take from the

3      legislative history on that particular point.  But on the face

4      of it, I think that the language of the 2006 statute is more

5      restrictive than the language that existed before, and nobody

6      made the argument that the 2006 amendments were meant to widen

7      the aperture of the government's investigative authority under

8      this provision.  I think it's worth asking, if the government

9      can get everything now under the 2006 language, what more could

10     it have got before that additional restriction was put in the

11     statute?

12             THE COURT:  How does it affect the relevant standard

13     that the government only has to show "reasonable grounds" to

14     believe the items sought are relevant?

15             MR. JAFFER:  That phrase is used in a lot of the grand

16     jury cases and the administrative subpoena cases.  In fact,

17     it's used with respect to the whole category of information.

18     So what courts will say is:  Are there reasonable grounds to

19     believe that this category of information will lead to relevant

20     information?  So it's actually a much more sort of attenuated

21     standard.  Certainly, a less stringent standard in the grand

22     jury context.  So it may be that the phrase "reasonable

23     grounds" makes the standard less stringent than it would

24     otherwise be.  But it's still at least as stringent as the

25     standard applied by courts in the grand jury and administrative

DBM8AMEA

1    subpoena context, and arguably less permissive than that

2    standard.

3            Your Honor, there are two other points I would like to

4    just make very briefly about accepting the government's theory

5    here.  One I already made, which is that if they can collect

6    these kinds of records under this authority, they can collect

7    them under other authorities as well.  The second is if they

8    can collect call records under this authority, there is no

9    reason why they can't collect all kinds of other records as

10   well.

11           The government argues the call records are distinctive

12   because they are interrelated, but many other kinds of records

13   are interrelated.  That's true of location information.  It's

14   true of financial records.  It's true of some kind of medical

15   records.  We have submitted a declaration from Edward Felten, a

16   professor of computer science, who explains how and why those

17   kinds of records are also interrelated.  So if you accept that

18   the government can get these kinds of records, you are

19   accepting that the government can get many others as well.

20           Then, finally, your Honor, if the government can

21   obtain these kinds of records in terrorism investigations,

22   there is no reason why it couldn't obtain these kinds of

23   records in other kinds of investigations as well.  The

24   government says that terrorism and national security

25   investigations are different, they are far-reaching, they are

DBM8AMEA

1    broad, but that's true of many other kinds of investigations as

2    well.  It's true of some insider trading investigations.  It's

3    true of some securities fraud investigations.  It's certainly

4    true of some drug trafficking investigations.  I think that if

5    you accept the government's theory here, you are creating a

6    dramatic expansion in the government's investigative power.

7            THE COURT:  In your view, is it factually incorrect

8    that the government needs to collect all metadata in order to

9    sufficiently identify connections between terrorists, or is it

10   your position that even if that is true, that it's not enough

11   to make the bulk collection relevant?

12           MR. JAFFER:  I am glad you have asked this question

13   because this is a point that to our argument I think is

14   crucial.

15           We are making both of those arguments.  Even if all of

16   this was necessary, it wouldn't be relevant in the sense that

17   the statute requires it to be relevant.  But I think maybe more

18   important, it's not necessary.  And we have submitted, again,

19   the Felten declaration which explains why it's not necessary.

20   You don't need all call records in order to do what the

21   government says it wants to do.  The government says it wants

22   to track the associations of suspected terrorists, and we can

23   certainly understand why the government would want to do that.

24   But you don't need to collect everything in order to do that,

25   and Professor Felten explains why that is true.

DBM8AMEA

1        The other thing that is worth noting here, your Honor,

2   is that even the government doesn't seem to argue anymore that

3   it is necessary to have all call records in order to do what it

4   wants to do here.  If you look at Judge Walton's opinion from

5   2009, which we cite on page 13 of our reply brief, that opinion

6   begins by saying, We authorize this program because the

7   government asserted in sworn affidavits that collecting all

8   call records was the only effective means to do what we want to

9   do here, which is, again, track the associations of suspected

10  terrorists.  And if you look at Judge Egan's opinion that was

11  issued in August over the summer and released over the summer,

12  it says the same thing on page 19 of that opinion.  It says

13  that we authorize this program because the government asserted

14  that this was the only way to track the associations of

15  suspected terrorists.

16        But if you look at the government's declarations in

17  this case, those phrases appear nowhere in the declarations.

18  It's actually quite a very conspicuous absence.  Where you

19  would expect to find those phrases, instead you find phrases

20  like, this is one tool that we could use, or, it may not be

21  feasible.  I am not saying that means that the government has

22  no interest anymore in collecting any of this stuff, but I am

23  saying that the interest that the FISA court relied on and said

24  was crucial to its ultimate decision to authorize the program,

25  the statements that the government made to the FISA court to

DBM8AMEA

1     result in the authorization of the program it no longer makes.

2          There may be good reasons for that.  Perhaps the

3     government has just changed its mind or it has recognized that

4     there are technological tools available to it that it didn't

5     recognize were available five or six years ago.  But for

6     whatever the reason, the point is that the government is no

7     longer saying what the FISA court thought was necessary for the

8     government to say in order to justify the program.

9          Your Honor, unless you have further questions about

10    the scope of the statute, I will just return to preclusion

11    briefly.  I want to make sure that I leave sufficient time for

12    my colleague to address the constitutional claims.

13         So the government has two different preclusion

14    arguments.  The first is that 18 U.S.C. 2712, which provides a

15    damages remedy for certain claims, implicitly precludes

16    plaintiffs' claim here.

17         I think it's useful and important, your Honor, to

18    start by remembering what the background rule is here because

19    the government forgets it in its briefs.  The background rule

20    here is the Administrative Procedure Act.  The Administrative

21    Procedure Act creates a strong presumption that Congress

22    intends judicial review of administrative action.  And that

23    presumption can be overcome only with clear and convincing

24    evidence.

25         The presumption is different for damages claims.  If

DBM8AMEA

1    we were making a damages claim, if we were asserting a damages

2    claim, it would be our burden to show that Congress intended to

3    create the right of action, but that's not true with injunctive

4    relief.  It's the government's burden to show clear and

5    convincing evidence.

6          I point that out in part because one of the cases that

7    the government relies on in *Jewel*, a California case involving

8    the warrantless wiretapping program, the whole premise of the

9    court's reasoning in the section on injunctive relief is that

10   it's the plaintiff's burden to show that Congress intended

11   there to be a right of judicial review, which is wrong.  It's

12   not the plaintiff's burden, it's the government's.

13         THE COURT:  For this Court to find that 2712 does not

14   preclude the statutory claim, do I have to find that *Jewel* was

15   wrongly decided?

16         MR. JAFFER:  You don't, your Honor, because *Jewel*

17   actually involved one of the subchapters listed in 2712.  So

18   three of FISA's four subchapters are listed and *Jewel* involved

19   one of those subchapters.  This case doesn't involve that.

20         That said, I do think *Jewel* was wrongly decided, and I

21   think if you look at the section of the injunctive relief part

22   of that opinion, you will see what I just said, that the court

23   cites the wrong burden.  So certainly the premise of the

24   court's analysis was incorrect.

25         On Section 215 itself, your Honor, the government

DBM8AMEA

1    argues that Congress precluded judicial review to people like

2    us by providing judicial review to the telecoms, to the

3    providers.  A few things here, your Honor.

4            First, the legislative history shows that Congress

5    added the judicial review provisions for providers not in order

6    to preempt or preclude any other claim, but, rather, because

7    the question of what process should be afforded to providers

8    had been a subject of litigation under the National Security

9    Letter statute.  So there is a separate set of cases in this

10   district before Judge Marrero involving a National Security

11   Letter provision.  Those cases involved a challenge by a

12   provider, and the question that was presented in those cases

13   was, what rights did the provider have to challenge the

14   national security letter that's been served on it?  And in

15   response to those decisions, Congress made these additions to

16   not just the national security statute, but to 215 as well,

17   explaining precisely what process the providers should have.

18           So that was congressional intent here.  And if you

19   read the government's briefs, the most that the government can

20   say on the other side is just that Congress never contemplated

21   that the targets of these orders would ever come into court,

22   because Congress never contemplated that they would learn of

23   this kind of surveillance.  I don't know whether that's true or

24   not, but even taking it as true, that doesn't meet the

25   government's burden.  It's not enough for the government to say

DBM8AMEA

1    Congress never considered.  The government has to establish

2    that Congress not just considered, but considered the claim of

3    particularity.  That's the language from the *Pottawatomi* case,

4    Justice Kagan's opinion.  It's the language from *Block* in the

5    D.C. Circuit.

6              The last thing I want to say relates to *Block* itself,

7    to the D.C. Circuit case that the government relies on heavily

8    in this part of its argument.  In that case, the D.C. Circuit

9    rejected a milk consumer's argument that the Agricultural

10   Marketing Agreement Act gave them an implied right of action to

11   challenge orders setting milk prices.

12             There are three things that were crucial to the

13   court's decision in that case.  The first was that extending a

14   cause of action to consumers would have undermined the

15   statutory scheme by allowing an end run around administrative

16   review requirements; the second is that the statutory scheme

17   was enacted to protect the producers, not the consumers who are

18   asking the court to recognize an action; and the third is that

19   Congress had extended a cause of action to another group,

20   handlers, milk handlers, whose interests were aligned with

21   those of the consumers.  No analogous thing can be said about

22   this particular context.

23             First, extending a cause of action to the plaintiffs

24   wouldn't allow us to do an end run around administrative

25   requirements, administrative remedies.  There is nothing to do

DBM8AMEA

1    an end run around.

2            Second, the statutory scheme here, FISA, was intended,

3    at least in part, to protect the privacy of people like our

4    clients, people like the ACLU, organizations like the NYCLU,

5    and all other Americans.  That was the point of FISA, to put

6    limits on the government's surveillance authority.

7            Finally, the interest of plaintiffs in the telecom

8    companies, the other group that Congress has allowed to sue

9    here, are not aligned.  That's true because most telecoms have

10   little interest in protecting the privacy of their subscribers.

11   Challenging Section 215 is time-consuming and costly.  Section

12   215 orders come from the same government that regulates them.

13   They are shielded from liability under 1861(e).  And even if a

14   provider had an incentive to challenge orders, there are

15   practical reasons why they wouldn't do so.  Marc Zwillinger,

16   the Yahoo attorney, sets out those reasons in testimony that we

17   cite on page 25 to our opposition to the government's motion to

18   dismiss.

19           Finally, as your Honor knows, no provider has yet

20   challenged a Section 215 order.  So the idea that providers are

21   standing in the shoes of the ACLU and NYCLU is far-fetched.

22           Unless you have further questions about the statute, I

23   will turn it over to my colleague.

24           THE COURT:  I don't at this point in time.  You can

25   turn it over, and I want to let the government know that they

DBM8AMEA

1    will get equal time.  You have already used 30 minutes, but

2    it's fine.

3              MR. JAFFER:  I apologize.

4              MR. ABDO:  Good morning, your Honor.  Thank you for

5    the Court's indulgence.

6              The argument so far has focused on the extraordinary

7    breadth of the government's interpretation of the term

8    relevant.  But beyond the statutory problems with the

9    government's theory are extraordinary constitutional ones.

10   Never before has the government attempted a program of dragnet

11   surveillance on Americans on this scale and the constitutional

12   questions that the program raises are therefore novel and

13   profound.  They go to the very nature of the relationship

14   between the citizens of this country and their government, and

15   they provide an independent basis to invalidate the

16   government's collection of plaintiffs' call records.

17             Moreover, to the extent there is any doubt about

18   whether Section 215 authorizes the form of dragnet surveillance

19   in which the government is now engaging, the substantial and

20   serious constitutional questions that that dragnet surveillance

21   raises counsel in favor of plaintiffs' narrower interpretation.

22             I will begin with the Fourth Amendment, your Honor.

23   There are two questions I think that are relevant to our Fourth

24   Amendment claim.  The first is whether the government's

25   collection or long-term collection of call records constitutes

DBM8AMEA

1    a search for Fourth Amendment purposes and the second is

2    whether that search is reasonable.

3          Long-term collection of call records constitutes a

4    search because it places in the government's hands an

5    extraordinary amount of information about Americans, including

6    the vast majority of whom are innocent Americans.  It reveals

7    who you call and when, whether you call your doctor, the

8    domestic violence hotline, an abortion provider, an

9    ex-girlfriend, a suicide hotline, or a pastor.  And it reveals

10   not just one of those details about every American, but every

11   one of those details.  As Professor Felten summarizes in his

12   declaration, telephony metadata, particularly when collected in

13   the aggregate, can be a proxy for content.

14         THE COURT:  Accepting the assertions of Professor

15   Felten that aggregated call data can reveal much more intimate

16   details of a person's life in just a person's call records

17   alone, would the search for Fourth Amendment purposes happen

18   when the government merely obtains the call records or when it

19   queries them?

20         MR. ABDO:  I think it would happen at the moment of

21   the collection, your Honor.  I think it's worth noting that the

22   premise of essentially all Fourth Amendment case law has been

23   that an individual's expectation of privacy is upset by

24   government action when the government obtains information in

25   which that individual has an expectation of privacy.  This is

DBM8AMEA

1    in part because the Fourth Amendment creates a private sphere

2    that the government cannot penetrate without sufficient cause.

3    And it's in part because the Fourth Amendment reflects an

4    historic uneasiness with entrusting to the government vast

5    quantities of information about Americans without

6    individualized determinations of cause.

7            The implications of the government's argument to the

8    contrary I think are really without limits.  It would allow the

9    government to wiretap and record every phone call in the

10   country, store those calls in a database for future searching

11   if and when a need arose.  It would allow the government to

12   photocopy every piece of mail sent in this country and store

13   those photocopies in a database subject to future searching.

14   It would allow the government to demand the membership lists of

15   every organization, including the ACLU, including the New York

16   Civil Liberties Union, and including every American to store

17   for future searching.

18           So I think it's important to understand the

19   implications of the government's argument that collection

20   itself doesn't implicate the Fourth Amendment.  I don't think

21   there are any cases that stand for that proposition.  Moreover,

22   if there were, in fact, such a gaping exception to the Fourth

23   Amendment, you would have expected the government to have run

24   through that exception many years ago and not just in recent

25   time.

DBM8AMEA

1          One way, I suppose, of thinking about the question as

2     well is to ask whether ordinary Americans expect that strangers

3     would acquire this information and be assured by the promises

4     of those strangers that they wouldn't look at them.  That's a

5     motive analysis the Supreme Court has often used.  And I think

6     most Americans would be shocked if they learned that strangers

7     were acquiring this information, and they would not be at all

8     consoled by the assurances of those strangers that they weren't

9     looking at them.  That's the expectation I think of most

10    Americans.  And that's an expectation that the Congress

11    recognized when it enacted, for example, the Wiretap Act which

12    criminalizes unlawful surveillance.  That act doesn't just

13    criminalize the government's unlawful use of information that

14    it has acquired through a wiretap, it criminalizes the

15    government's unlawful acquisition in the first instance.

16         Now, of course, future use of information can

17    aggregate an initial search, but the search for constitutional

18    purposes happens at the outset.

19         I would like to address one of the government's other

20    arguments when it comes to the question of whether collection

21    is a search.  Because the government doesn't dispute Professor

22    Felten's claims regarding how revelatory aggregated call

23    records can be in the government' possession.  They really

24    quibble with the legal underpinnings of our claim.  And, of

25    course, their other primary claim is that the Supreme Court's

DBM8AMEA

1    decision in *Smith v. Maryland* decides this case or controls

2    this case, and that simply is not true.

3          *Smith* was a dramatically different case.  It involved

4    a targeted use of a pen register against an individual

5    suspected criminal over the course of a matter of days, and it

6    did not involve a dragnet collection or bulk collection of call

7    records.  It would have been, I think, a vastly different case

8    and people would have understood its significance differently

9    had the government, in targeting Michael Smith in that case,

10    assembled a database of all American's call records and merely

11    queried that database in pursuing Mr. Smith.  I think everyone

12    would have understood the constitutional questions presented in

13    that case to have been different, and we certainly would have

14    hoped that the outcome would come out differently had the

15    Supreme Court understood the case to stand for that

16    proposition.

17          THE COURT:  If *Smith* doesn't control, what rule is

18    this Court to apply?

19          MR. ABDO:  I think the question the Court should

20    attempt to answer is the one that the Supreme Court set out in

21    *Katz*, which is whether plaintiffs have an expectation or a

22    reasonable expectation of privacy in the sum of their call

23    records in all of their associations?  That's a question that

24    the Supreme Court itself recognized in *United States v. Jones*,

25    all nine justices recognized, presents a different question

DBM8AMEA

1    when it comes to bulk collection.  Four of the justices writing

2    for the court would not have resolved that question because

3    they thought they could resolve the case on a narrower ground

4    of trespass theory.  But five of the justices in *Jones* would

5    have resolved that question against the government, recognizing

6    that bulk collection implicates an expectation of privacy in a

7    significantly different way.

8         THE COURT:  Can this Court rely on concurring opinions

9    in *Jones* to conclude that *Smith* doesn't control here?

10        MR. ABDO:  I don't think the Court needs to or has to.

11   We are not contending that *Jones* controls this case.  We are

12   simply contending that its analysis is relevant to the

13   expectation of a privacy analysis.  I think the antecedent

14   question is whether *Smith* controls this case?  And we don't

15   think that's true for the reasons I have said.

16        THE COURT:  How do the factual differences from *Smith*

17   add up to a constitutional difference here?

18        MR. ABDO:  I think that's right.  The Supreme Court

19   recognized that basic proposition in *United States v. Knotts*,

20   which was a case in which the government used a beeper to track

21   the public movements of a car that was suspected of being

22   involved in drug trafficking.  And the petitioner in that case

23   didn't so much quibble with the general proposition that

24   individuals generally have little expectation of privacy as

25   they travel in public, but the focus of his argument in the

DBM8AMEA

1   case was that accepting that rule in an individual case might

2   allow pervasive surveillance of Americans all the time.  And

3   the Supreme Court was very careful to carve out that question

4   and it said, bulk collection for pervasive surveillance raises

5   a different question, and we will have time enough to address

6   that question if and when it arises.

7           It first arose, I think, in a way that could serve as

8   a model for this Court in the D.C. Circuit's decision in *United

9   States v. Maynard*, which is the appellate decision that came

10  before *U.S. v. Jones*.  And the government argued very

11  forcifully in that case that *Knotts* controlled the outcome,

12  that using a GPS device to track an individual over the

13  long-term is no different than the beeper in *Knotts*, and that

14  therefore *Knotts* controlled the case.  And the D.C. Circuit

15  rejected that argument.  It said *Knotts* does not control this

16  case, in the same way we argue *Smith* does not control this

17  case, and they explained at length why they thought the

18  question was a different one and why the expectation of privacy

19  question comes out differently.

20          So I don't think the Court needs to rely on *Jones* as

21  binding, but of course I think it's persuasive precedent when

22  it comes to the question of what Americans' expectation of

23  privacy is in bulk collection of information.

24          THE COURT:  You want to turn to your First Amendment?

25          MR. ABDO:  I will be brief on the First Amendment.  I

DBM8AMEA

1    just want to emphasize three points.

2              THE COURT:  Actually before we leave *Smith*, at what

3    point is phone data collection no longer controlled by *Smith*?

4              MR. ABDO:  I think that's a very difficult question

5    and one that this Court doesn't have to address.  I will try to

6    address it in a moment, but I don't think the Court has to

7    address it, in part for the same reason that the D.C. Circuit

8    didn't feel the need to address it in *Maynard* and for the same

9    reason that the five concurring justices in *Jones* didn't think

10   it necessary to address.  That no matter where the line is,

11   surely it is unreasonable the government's indefinite and

12   pervasive collection of Americans' call records.

13             In terms of taking your question on the merits and not

14   trying to dodge it, it's a difficult question.  It would

15   require the Court to answer at what point Americans'

16   expectation of privacy is upset.  I think for guidance, the

17   Court can look, for example, to some of the pen register

18   authorities that the government has relied upon, some of which

19   allow collection for 60 or 90 days, but those authorities are

20   also only available to the government when it makes an

21   individualized application to a court and obtains court

22   approval.  So it might mean that there would be a gradient of

23   rules that would apply.  For one or two days you wouldn't need

24   to go to a court, for 60 or 90 you would need to go to a court,

25   and for pervasive surveillance you would need to satisfy the

DBM8AMEA

1    strict requirements of the Fourth Amendment, warrants and

2    probable cause requirements.  But again, I don't think this

3    Court needs to answer those questions.  Surely, unreasonable is

4    pervasive surveillance.

5              To turn back to the First Amendment question, just to

6    highlight a few points.  The protection of the First Amendment

7    is distinct from the protection of the Fourth Amendment, even

8    when it comes to government's investigatory tools.  And I think

9    that's perhaps nowhere clearer than in the Second Circuit's

10   decision in *Tabaa*, where it separately analyzed the Fourth

11   Amendment question and the First Amendment question and made

12   clear that the First Amendment imposed a different burden.

13             We are not suggesting that every Fourth Amendment

14   search predicated on a warrant based upon probable cause needs

15   to survive the strictest of court review, because as a general

16   matter, most tailored Fourth Amendment searches will survive

17   First Amendment scrutiny as well.  But it is particularly

18   important to apply the First Amendment when the government's

19   surveillance reaches as broad as it does in this case, and

20   indeed, when the government says that the Fourth Amendment

21   provides no independent protection whatsoever.

22             Because the First Amendment applies and is independent

23   of the Fourth Amendment, the Court really has two questions to

24   answer.  First is whether the government's collection of call

25   records imposes a substantial burden on First Amendment rights.

DBM8AMEA

1    And it clearly does.  The government has collected essentially

2    all of Americans' associational records.  The case outstrips

3    even the Supreme Court's decisions in *NAACP v. Alabama* or

4    *Shelton v. Tucker* in which states have sought to acquire

5    invasive --

6              THE COURT:  Isn't this case different from the *Alabama*

7    case, in that you can't know if the government will ever

8    actually look at and analyze the ACLU's call records?

9              MR. ABDO:  I don't think that distinction is a

10   meaningful one.  Those cases stand for the proposition that

11   when the government collects associational information of that

12   scale and of that intrusiveness, the First Amendment is

13   violative because associational information has been handed

14   over to the government.  But they also recognize that there is

15   a common sense way, in which allowing the government to acquire

16   that sort of associational information infringes individuals'

17   ability to associate with others; it chills context.

18             If you look, for example, at the Second Circuit's

19   decision in *Local 1814*, in which an interstate commission

20   sought to acquire payroll records for longshoremen in New York

21   and New Jersey, the court was aware that there were differences

22   between that case and *NAACP v. Alabama*.  The commission wasn't

23   going after the longshoremen.  It was in fact going after the

24   union itself.  But the court recognized that the longshoremen

25   would have been chilled in a very obvious and common sense way.

DBM8AMEA

1    It didn't demand the kind of history that *Alabama* had to it.

2              THE COURT:  Is there a substantial burden with no

3    evidence of actual chill?

4              MR. ABDO:  Yes.  I think *Local 1814* stands for that

5    proposition.  Chill is an inherently difficult fact to prove.

6    It generally requires proving a negative that someone didn't

7    contact us who may have contacted us.  Of course, at the moment

8    they choose not to contact us, the evidentiary trail runs dry.

9    So for that reason, the Second Circuit has taken this common

10   sense approach.

11             It described *Shelton v. Tucker*, which is another

12   associational case, as standing for the general proposition

13   that when there is a common sense chill that would be worked

14   upon the organization complaining, courts shouldn't turn a

15   blind eye to that common sense.

16             I guess another way of thinking about it is this.  If

17   the NSA had knocked on the doors of every American in this

18   country and demanded that they turn over a list of every call

19   they had made that day and for the previous five years, there

20   would be no question but that the First Amendment would be

21   implicated, no matter what the government's intended use for

22   that information, and no matter what limitations the government

23   had put in place for itself on the use of that information.

24   That case is, for all practical purposes, no different than

25   this one.

DBM8AMEA

1    If there are no other questions, I will sit down.

2    Thank you.

3         THE COURT:  Thank you, Mr. Abdo.

4         Mr. Delery.

5         MR. DELERY:  May it please the Court.  Over the past

6    several months there has been significant public discussion

7    about a number of alleged surveillance activities.  This case

8    concerns one specific program that the government has

9    officially acknowledged, the NSA's collection of bulk telephony

10   metadata pursuant to orders of the Foreign Intelligence

11   Surveillance Court, and under a provision of FISA that Congress

12   has twice extended, without change, after having been briefed

13   on this program.

14        The details of the program are important and haven't

15   much been discussed this morning, and I would like to start by

16   just highlighting a couple of those elements.

17        The records collected are business records of

18   telecommunications carriers that are prepared for other

19   business purposes, and may include information such as the

20   numbers placing and receiving calls, routing information, and

21   the time and duration of calls.  But under this program, the

22   government does not collect the content of any conversation,

23   listen to any calls, or even collect the identifying

24   information about customers or parties to the calls.

25        In addition, the data may only be searched for

DBM8AMEA

1    counterterrorism purposes, and only then, and then only, if

2    there is reasonable articulable suspicion to believe that the

3    selection term or the number to be queried is associated with

4    specified foreign terrorist organizations.  And as the briefs

5    lay out, the FISC has established other controls on the program

6    as well.

7            The public debate has focused on the wisdom of this

8    program, given its scope, and Congress is currently considering

9    various proposals to alter it.  That's a discussion the

10   Executive Branch has said it is important to have.  But the

11   merits question in this case is whether the program is lawful,

12   and the answer is yes.  It's authorized by statute and it's

13   constitutional.

14           The Court, however, need not reach those questions

15   because the complaint doesn't properly establish plaintiffs'

16   standing and the Court lacks jurisdiction over the statutory

17   claim.  And so for all of those reasons, the threshold

18   questions and the merits, the government urges the Court to

19   grant the motion to dismiss, and obviously to deny the

20   preliminary injunction which seeks to limit a national security

21   program that has been repeatedly approved by all three branches

22   of government.

23           So I would like to start, if I might, with the

24   question of standing.  Plaintiffs' claims of harm in the

25   complaint are speculative, not the kinds of concrete,

DBM8AMEA

1  particularized, or certainly impending injury that the Supreme

2  Court has required.  There are really two types of injury that

3  the complaint alleges, and obviously on preliminary injunction

4  these have to be proved and not just alleged.

5       The first is that the government has reviewed or might

6  review plaintiffs' telephony metadata, call detail records, to

7  identify people who associate with the plaintiffs.  But under

8  the FISC's orders, the NSA may only review records responsive

9  to queries using identifiers that are believed, numbers

10  believed, based on reasonable articulable suspicion, to be

11  associated with a foreign terrorist organization.  There is no

12  allegation, much less proof, that the government has reviewed

13  plaintiffs' metadata under this so-called RAS standard or

14  otherwise, much less created the kind of comprehensive profile

15  that plaintiffs reference.

16       The government has argued this expressly in their

17  briefs and there has been no response on either motion.  And

18  the Supreme Court's decision in *Amnesty International v.*

19  *Clapper* teaches that the kind of speculative harm then that the

20  plaintiffs are claiming here would not be sufficient to allow

21  the Court to pass on that claim.

22       THE COURT:  Isn't there a difference between this case

23  and the *Amnesty* case, in that there is no dispute here that the

24  ACLU's call records have been collected by the government?

25       MR. DELERY:  That is true, your Honor, at least as to

DBM8AMEA

1    the 90 day period covered by the secondary order that has been

2    publicly acknowledged and reclassified.  That order, coupled

3    with the plaintiffs' declarations, leads the government not to

4    challenge the question of collection as to that time period.

5             But while we are not saying that collection alone

6    could never lead to a concrete, actionable injury that might

7    provide standing, the plaintiffs' complaint and supporting

8    papers have not established such an injury here.  The injuries

9    that they identify, the creation of a comprehensive profile, or

10   the second one, that persons who might be interested in talking

11   to the plaintiffs might be chilled from doing so, are

12   speculative.  There is nothing to support that either of those

13   things has happened.  Indeed, the declarations don't identify

14   anyone who has refrained from contacting the plaintiffs because

15   of the kinds of concerns that are identified here.

16            So cases like *Clapper* and the *Laird* case from the

17   Supreme Court suggest that therefore, at least on this record,

18   the plaintiffs have failed to establish standing.

19            THE COURT:  In the context of the Fourth Amendment, if

20   the plaintiff can plausibly allege that its own Fourth

21   Amendment rights have been violated, isn't that an injury in

22   fact?

23            MR. DELERY:  Your Honor, if you read the complaint to

24   have alleged that much, I think we would agree that the

25   plaintiffs have standing at least to argue that they have a

DBM8AMEA

Fourth Amendment interest that has been put in issue here.
However, there the inquiry quickly collapses into the merits,
and we will come back to that later.  The government's
position, obviously, is that there is no Fourth Amendment
privacy interest that is implicated by collection of the
third-party business records that are at issue here as you were
just discussing.  But, in any event, the Fourth Amendment is
not infringed unless and until the government or some person
actually looks at the data, and that's the teaching of the
*Horton* case and the *VanLeeuwen* case and others that we have
cited in the brief.

        I would submit, your Honor, this also quickly then
collapses into the question of irreparable harm for the
purposes of the preliminary injunction.  So even if you are
satisfied that there is a modicum of injury to clear the
Article III standing hurdle, we think that the level of injury
is clearly insufficient to support a preliminary injunction.

        THE COURT:  Is it possible that the ACLU has standing
to bring some of its claims but not others?

        MR. DELERY:  Yes, your Honor.  I think that goes to
the second of the jurisdictional arguments that we have raised.
The statutory claim here is impliedly precluded by FISA's
detailed scheme for judicial review, which sets out who may
challenge 215 orders and where those challenges have to be
brought.  And the answer is the organizations that are the

DBM8AMEA

1    recipients of the production orders and in the FISC, the FISA

2    court established by Congress to hear these and other foreign

3    intelligence matters.

4          The APA's waiver of sovereign immunity does not apply

5    when Congress specifies a particular forum for limited parties

6    for judicial review.  And that's what the Supreme Court said in

7    the *Block v. Community Nutrition Institute* case.  The APA

8    itself in Section 702 recognizes this issue of implied

9    preclusion.  And here there are several elements of the statute

10   that establish that the FISA court process is the exclusive

11   mechanism for hearing challenges to applications under the

12   statute.

13         The first is 215 itself, which together with Section

14   1803, which establishes the FISA court, the statute provides

15   that recipients may challenge the production order with the

16   FISC's so-called review pool.  That's in subsection (f).  Then

17   either the recipient or the government can appeal to a court of

18   review and then ultimately seek certiorari in the Supreme Court

19   if necessary.  But 215 does not allow challenges by third

20   parties who, as plaintiffs have acknowledged, should not know

21   about the existence of the orders.  And this was a deliberate

22   choice by Congress reflected in the legislative history to

23   create a secret given the national security interests at stake

24   and expeditious process.  And the legislative history

25   references are cited at page 6 of our motion to dismiss brief.

DBM8AMEA

```
 1              There are several other relevant parts of the statute
 2     as well.  The first is that unlike some other provisions of
 3     FISA, the statute does not provide for a suppression remedy or
 4     an opportunity to challenge adequacy under the statute.  And
 5     the other FISA examples are in footnote 7 of our motion to
 6     dismiss brief.  215 is not one of them.  As your Honor pointed
 7     out earlier, 1861(f)(2)(D) provides that an order issued
 8     pursuant to this provision shall remain in full effect unless
 9     it has been explicitly modified or set aside under the
10     procedure that's specified in the statute, which is quite a
11     strong statement by Congress, that a validly issued
12     procedurally regular order of the FISA court shall remain
13     valid, unless the appeal process, which could go up to the
14     Supreme Court, that is specified is followed.
15              The other statute was also discussed earlier, your
16     Honor, and that's 18 U.S.C. 2712, which provides for damages
17     actions for violations of three specific provisions of FISA,
18     again, not including Section 215, and does not provide for
19     injunctive relief.
20              THE COURT:  2712 has another phrase in it that the
21     government didn't focus on.  It says "for any claims within the
22     purview of this section" before it lists the three FISA
23     provisions.  Wouldn't violations of other sections of FISA be
24     outside the purview of Section 2712 given that qualifying
25     language.
```

DBM8AMEA

1          MR. DELERY:  I think what 2712 establishes, your

2     Honor, again, together with the other provisions of FISA that

3     create suppression remedies for particular types of orders, is

4     that where Congress intended to allow third parties outside of

5     the recipients of a particular order to challenge the order in

6     one way or the another, it knew how to do it, and it did do it

7     in certain specific instances, but not with respect to Section

8     215.

9          THE COURT:  What about the government's argument in

10    *EPIC* that a district court challenge is not a challenge to a

11    FISA order, but rather it's a challenge to executive action?

12         MR. DELERY:  I think, your Honor, if you look at the

13    *EPIC* brief in totality, in addition to pointing out that as

14    opposed to bringing a case as an initial matter in the Supreme

15    Court it should be brought in district court in the first

16    instance, the brief made clear that we would be making the

17    preclusion argument that we are making here in district court

18    as well.  It laid out that that was a reason to follow the

19    regular order because the same preclusion argument would apply

20    to an original action in the Supreme Court, and the brief

21    detailed why original or appellate jurisdiction in that context

22    didn't lie in the Supreme Court.

23         The last thing thing I would highlight on this

24    question, your Honor, is Congress actually considered and

25    rejected a proposal for district court challenges to 215 orders

DBM8AMEA

1    in 2006.  That's the references on page 18 of our motion to

2    dismiss brief.  Which is further confirmation that this was not

3    a question that Congress didn't think about at the time.

4    Section 215 and the related provisions of FISA reflect a

5    deliberate choice about where and by whom challenges to orders

6    under this provision could be brought.  And under the Supreme

7    Court's decision in *Block* and others, that means that claims

8    like the ones that the plaintiffs have brought here is

9    precluded.

10            THE COURT:  Did it mean to preclude suits altogether

11    or just presume that there wouldn't be any because everything

12    was confidential?

13            MR. DELERY:  I think that if you look at the

14    legislative history, there was consideration to providing for

15    other types of challenges.  Certainly, one of the reasons why

16    third parties should not be invited into this process was the

17    fact that given the national security interests at stake, it

18    was contemplated that the procedures would be in secret, and,

19    in fact, the statute requires that the filings and proceedings

20    be conducted pursuant to appropriate security arrangements.

21    But I think that the statutory language and the absence of a

22    215 remedy, as was provided with respect to other types of FISA

23    orders, suggests a stronger intent than just an assumption that

24    they would remain secret.

25            In fact, under the plaintiffs' theory, there wouldn't

DBM8AMEA

1    be any reason why other requirements other than relevance

2    couldn't be challenged in district court, including the

3    adequacy of particular minimization procedures or compliance

4    with Executive Order 12333, also elements of the overall

5    scheme.  The government would submit that that kind of

6    intrusion into the workings of this type of national security

7    program is inconsistent with the framework and the statute that

8    Congress established.

9         I think if I could then turn to the statute itself,

10   your Honor, and the scope of Section 215.

11        The collection of bulk telephony metadata is relevant

12   within the meaning of Section 1861(b)(2)(A) because the key

13   investigative purpose of terrorism investigations is to find

14   connections between known and unknown terrorists, and unless

15   the NSA aggregates records created by different companies and

16   over time, the analytical tools that are available to NSA to

17   identify chains of communications and those connections would

18   not operate as effectively.  And I would like to highlight

19   three main reasons why that conclusion is correct.  The text

20   and structure of the statute, the nature of counterterrorism

21   investigations, and third, the ratification by Congress.

22        So, first, on the text and structure instructor of the

23   statute.  Congress clearly intended a broad scope for 215.  It

24   used the term "relevant," that under its ordinary definitions,

25   even plaintiffs recognize, has a broad meaning, appropriate to

DBM8AMEA

1    or bearing on the matter at hand.  And not only has Congress

2    presumed to adopt ordinary background assumptions about

3    statutory terms that the legislative history suggests that it

4    did so here, and was intending to invoke broad investigatory

5    authority, the addition of the relevant requirement in 2006,

6    and I think it's clear from the legislative history, was not

7    meant to narrow or create a narrowing of the authority under

8    Section 215, contrary to plaintiffs' suggestions.

9         If you look at the legislative history that we cited

10   in the reply brief at page 12, footnote 15, I think that

11   statement is clear.  In fact, the House report made clear that

12   the 2006 addition of relevance was intended to basically codify

13   the then existing understanding and practice, again, not to

14   narrow it further.

15        THE COURT:  Does the insertion of the word "relevant"

16   then have any meaning?

17        MR. DELERY:  It certainly does have meaning, your

18   Honor, and obviously it's the obligation of the courts, as the

19   FISC has done, to give it effect.  But the legislative history

20   explains how it came to be, which was to clarify an existing

21   practice.

22        THE COURT:  Are grand jury subpoenas an appropriate

23   place to look for the definition of relevance?

24        MR. DELERY:  Certainly, the grand jury analogy has a

25   bearing on this question and legislative history refers to that

DBM8AMEA

1   to some extent.  I don't think it's the end of the inquiry,

2   however, because of some of the other elements of the structure

3   of the statute and Congress's attempt that I will come to in a

4   moment.  But even looking at grand jury practice itself, it's

5   long established that grand juries have broad and wide-ranging

6   investigative powers.  They don't need to be focused at the

7   outset on an individual potential target.

8           THE COURT:  But 17(c) is not really a relevance

9   requirement, is it?  It's really a question of whether it's, in

10  the words of 17(c), unreasonable or oppressive?

11          MR. DELERY:  And the Supreme Court has made that clear

12  in resisting attempts to impose on the government or the grand

13  jury at the outset a tight focus on a particular target of an

14  investigation.  As the Supreme Court said in *R. Enterprises*, a

15  grand jury can be investigating to find out whether a crime has

16  even been committed at the earlier stage, even than focusing on

17  who might have done it, or even to satisfy itself that a crime

18  has not been committed.  So it has quite a wide-ranging

19  authority.

20          I think if you take the term "relevant" and then focus

21  on where it comes in the sentence though, it's clear that

22  Congress has established a deferential standard, reasonable

23  grounds to believe that they are relevant to an authorized

24  investigation, which seems to contemplate an element of

25  judgment on the part of the government and national security

DBM8AMEA

1    professionals.

2           Again, Congress considered and rejected a proposal in

3    2006 to limit the scope of this provision to individuals who

4    are actually suspected of terrorist activity, and that was done

5    at the same time that the relevant standard was added to the

6    statute, which again suggests that the type of analysis that at

7    least in the briefs at times the plaintiffs seem to urge a much

8    narrower focus was something that Congress considered and

9    rejected.

10          The last thing I will say on the structure of the

11   statute is that it also built in protections recognizing the

12   broad scope of the material that could be collected under 215,

13   designed to ensure that the government gets all the information

14   it needs for national security investigations, but protects

15   U.S. person information.  So in Section 1861(g)(2), which

16   requires minimization procedures, it reflects an understanding

17   that the government will get records from unconsenting U.S.

18   persons, and that the court would need to ensure that there

19   were protections built in for the handling of that information.

20   And that's, of course, what the FISC has done repeatedly here.

21          These terms in the statute and these phrases, we would

22   submit, need to be understood in light of the nature, purpose

23   and scope of counterterrorism investigations.  The Supreme

24   Court in *Oklahoma Press* made clear that that's the question for

25   any kind of relevance inquiry, and it's certainly true here.

DBM8AMEA

1    These investigations are different from ordinary or what we

2    might think of as ordinary criminal investigations, which are

3    focused on a particular event in the past that you may be

4    trying to explore.  These investigations are designed to

5    detect, disrupt, and prevent ongoing or even future terrorist

6    attacks, terrorist plots, so that they can prevent attacks

7    before they occur.  The investigations are necessarily

8    predictive.  They are prospective.  They are looking for

9    patterns.  They are far-reaching in terms of across time and

10   geographic scope.  And the declaration submitted from an FBI

11   official, the Holley declaration, at paragraph 17 and 18,

12   describes these attributes.

13           A key focus here is that information or connections

14   that are important to the investigation may not be known at the

15   outset.  That's why a historical retrospective analysis of a

16   data set that is compiled across time and across

17   telecommunications carriers is critical.  The same type of

18   analysis could not practically be done with the kind of

19   targeted intelligence gathering focused on just the call

20   records of somebody who you already know or suspect to be

21   associated with terrorism.  And the Supreme Court in the *Keith*

22   case highlighted this distinction between ordinary criminal

23   investigations and the broader requirements of intelligence

24   investigations.

25           Significantly, your Honor, the plaintiffs have not

DBM8AMEA

1    offered any theory of Section 215 or any relevant standard that

2    would make sense for the statutory purpose and the nature of

3    investigations that it was clearly designed to address.  As I

4    indicated earlier, in fact, at least the position in their

5    briefs, which I think they may have walked away from some this

6    morning, that it should be enough to get the records of

7    somebody that you actually suspect of having a connection to

8    terrorism, was considered and rejected by Congress.  So that is

9    not a reading that would comport with congressional intent.

10   And they haven't offered any other definition of relevance that

11   would be an appropriate fit for the scope of this statute.

12            THE COURT:  The government appears to focus on

13   relevance to the authorized investigation by limiting it only

14   with respect to the application of investigative techniques.

15            Couldn't it just as easily mean relevant to the

16   subject matter of the investigation as opposed to investigative

17   techniques?

18            MR. DELERY:  I do think it says relevant to an

19   authorized investigation, so that might have several

20   components.  I think it's true that we have focused on the

21   relevance to this particular analytical tool that NSA uses.

22            THE COURT:  The technique here is limitless, right?

23            MR. DELERY:  I do think you're correct, your Honor,

24   that relevance often has a subject matter component and

25   analogies to other types of investigations, grand jury or even

DBM8AMEA

1    civil discovery, and in many ways it's closely related to the

2    idea of the technique.  The point of the NSA's analysis is to,

3    as the declarations made clear, identify connections between

4    known and unknown terrorists, particularly those who might be

5    in the United States, ongoing plots.  So I think whichever way

6    you look at it, the information is relevant and tied to the

7    purpose for which it is being collected.

8           I think, your Honor, it's significant then that the

9    restrictions that the FISC has imposed and the minimization

10   procedures are carefully calibrated to this purpose so that the

11   information can be used only for counterterrorism purposes.  It

12   can only be queried where there is articulable suspicion that

13   the number you want to inquire about has a connection to

14   terrorism.  And the government is expressly precluded from

15   using the data for other purposes, including many of the things

16   that the plaintiffs are concerned about.

17          THE COURT:  If all of the call records are relevant,

18   why aren't they all turned over to the FBI?

19          MR. DELERY:  There are a couple of answers to that,

20   and these are reflected in the declarations.

21          One is the sharing of information with the FBI has a

22   practical element and the NSA has the analytical capability to

23   identify the connections that would be useful investigative

24   needs for the FBI.  As I think the Shea declaration makes

25   clear, NSA exercises its own analytical judgment, intelligence

DBM8AMEA

1   judgment, to identify which of the hits that might be returned

2   from a query are worth following up on which don't seem to be.

3   So there is a practical element to providing the FBI with

4   investigative leads that would be useful for the purpose for

5   which they would be provided.

6          Second, I think -- again, this is a reflection of the

7   minimization procedures.  I think the government in its

8   application, you can see it in the recently released

9   application from 2006, the FISC in its orders has recognized

10  that the scope of this program raises certain concerns.  And so

11  the FISC has been very careful to provide, as required by

12  statute, for restrictions on the use and dissemination of

13  information, particularly related to U.S. persons.

14         So that's why I say the program is carefully

15  calibrated to the purpose for which it is being used and isn't

16  the kind of indiscriminate use of the data that plaintiffs

17  suggest.

18         THE COURT:  There seems to be a tension here.  If it's

19  simply a practical consideration, namely, that it's the NSA

20  that has the analytical capacity to go through the metadata,

21  why the legal prohibition on providing all of it to the FBI?

22         MR. DELERY:  I think it is, again, your Honor, a

23  combination of the practical aspect and --

24         THE COURT:  Why should the practical impinge on the

25  legal?  Shouldn't be the FBI have access to all relevant

DBM8AMEA

1    material?

2        MR. DELERY:  The FBI certainly is getting the benefit

3    of all of the relevant material.  The analysis is being

4    conducted by the NSA.  And this structure, which again reflects

5    the application that the government made in 2006 and the order

6    of the FISC, reflects a balance which should be relevant for,

7    to use a word, the statutory analysis and also for any

8    reasonableness inquiry under the Fourth Amendment.

9        I think significantly, your Honor, that brings me to

10   the third main point about the text of this statute, which is

11   that Congress has ratified this construction of Section 215 to

12   allow the collection of bulk telephony metadata by extending

13   the authority of Section 215 twice, in 2010 and 2011, without

14   change, after having been notified and provided information

15   about the bulk telephony metadata program.  There were, as we

16   have detailed, many briefings of the intelligence committees

17   and the judiciary committees.  In December of 2009, a

18   classified paper setting out the scope of the program under the

19   215 authority was provided to the intelligence committees of

20   both the House and Senate, and was made available to all

21   members, and that was before the 2010 extension of the sunset

22   date.  And in 2011, similarly, an updated paper was provided to

23   the intelligence committee and made available at least on the

24   Senate side.

25       THE COURT:  How can you argue that Congress ratified

DBM8AMEA

1     this understanding of Section 215 when, for example, in the

2     papers submitted I learned that the classified document

3     describing the program was not even made available to the House

4     of Representatives in 2011?

5                MR. DELERY:  It was made available to the House of

6     Representatives to all members in 2010.  In 2011, it was made

7     available only to certain committees, the intelligence

8     committee, not to all members.  The intelligence committees of

9     both the House and Senate, I think it is long established,

10    serve a critical function in overseeing national security

11    affairs, and in particular the activities of the intelligence

12    community, and the purpose for structuring them the way they

13    are is so that they can stand in the shoes of the broader

14    membership and the public when dealing with individual programs

15    that deal with classified information.  I think the test that

16    the Supreme Court has identified is that Congress ordinarily is

17    presumed aware of administrative and judicial interpretations

18    of a statute.

19                THE COURT:  A veteran congressman, Congressman

20    Sensenbrenner, submitted an amicus brief in this case, didn't

21    he, in which he said he had no idea of what was happening?

22                MR. DELERY:  It is certainly true that some members of

23    Congress have expressed sentiments like that, and he is one of

24    them.  I think the record establishes that the intelligence and

25    judiciary committees of both houses were briefed, and again,

DBM8AMEA

1   there were materials made available on both sides, and

2   certainly at the time of the first reauthorization in 2010 made

3   available to all members of Congress that again made clear the

4   scope of the program.

5          THE COURT:  Were the FISC opinions made available to

6   Congress?

7          MR. DELERY:  I believe certainly some of the FISC

8   opinions, at least over time, has now been revealed in some of

9   the materials released.

10          THE COURT:  That's since June 15, right?

11          MR. DELERY:  They have been released publicly since

12   June 15.  Some of the materials that have now been released

13   reflect the -- I want to say in 2009, although I am not

14   positive, we can get back to that -- provision of some of the

15   opinions, for example, on the compliance incidence, that those

16   were provided to the oversight committees at the time, not just

17   this year after the disclosures.

18          THE COURT:  Even when you say in your brief, and as

19   you have said here, they were "made available," that's in one

20   location for a very limited period of time in 2010 and to only

21   one house of Congress in 2011, right?

22          MR. DELERY:  Not quite, your Honor.  I think in 2011,

23   it was made available to all senators.  As I indicated before,

24   in 2010, the actual classified paper was kept in the secure

25   space on Capitol Hill, as classified documents would be kept in

DBM8AMEA

1    a particular location.

2              THE COURT:  In a SCIF for a limited period of time.

3              MR. DELERY:  But as I understand it, a letter went out

4    to all members on both sides, both the House and the Senate,

5    telling them that significant information about a program

6    relevant to the reauthorization was available here, and not

7    only making that available, but making members of the

8    intelligence committee staffs available to answer questions

9    that members might have about the program.

10             So I think in ratification cases, often there is no

11   real expectation that any member of Congress has focused on a

12   particular provision.

13             THE COURT:  It's a presumption, right?  And a

14   presumption can be overcome, right?

15             MR. DELERY:  Certainly, ordinarily here.

16             THE COURT:  If a presumption that Congress is aware of

17   the Court's interpretation of a statute can ever be overcome,

18   isn't this the case?

19             MR. DELERY:  I would submit not, your Honor, because

20   here, regardless of the limits, given the need to handle the

21   document in a classified way, there was much more of a direct

22   effort to get information to the members.

23             THE COURT:  The Executive Branch worked to do it, but

24   they didn't succeed, did they?

25             MR. DELERY:  Your Honor, I am not saying that every

DBM8AMEA

1    member read these materials.  I think what we can say is that

2    the members of the relevant committees on both sides were

3    briefed, and that the chairs of those committees drew the

4    attention of all members to this issue and the need to focus on

5    it.

6         The plaintiffs have identified a statement in one of

7    the briefs from Senator Wyden where he expresses many of the

8    concerns that are expressed here.  And he did that in

9    connection with the debate on the reauthorization of 2011,

10   again, trying to emphasize what was at stake in the vote to

11   extend the authority.  So, again, unlike often in ratification

12   cases with invariably obscure provisions, I think the record

13   establishes that this was focused on more than you would have

14   in the ordinary case.

15        If I could turn now to the Stored Communications Act

16   issue--

17            THE COURT:  Fine.

18            MR. DELERY:  -- that the plaintiffs have raised.

19        I think the significant point is that 1861 (c)(2)(D),

20   part of Section 215, added in 2006, is a later enacted

21   provision than 18 U.S.C., Section 2703.  And it authorizes

22   production under Section 215 of tangible things that could be

23   obtained by a grand jury subpoena or "with any other order

24   issued by a court of the United States directing the production

25   of records of tangible things."  Section 2703(d), a subsection

DBM8AMEA

1    of the statute that plaintiffs have identified, allows the

2    production of call detail records by order in a criminal case.

3    So by structure of the statute, which was intended to provide

4    Section 215 authority for categories of documents that could be

5    obtained through other forms of legal process, Congress has

6    expressly authorized the collection of call detail records

7    under this provision.

8            So that is an express authorization that you don't

9    even need to reach the question of implied exceptions to the

10   list.  As your Honor pointed out earlier, Section 215 also

11   allows the government to obtain any tangible things without

12   restriction.  There is certainly nothing that I am aware of in

13   the legislative history that suggests that 2703 was a limit on

14   that broad authority.  And as was discussed, the FISC

15   considered and rejected this argument in 2008, that having 2703

16   carve out a category of records that would otherwise be

17   available under 215 would be inconsistent with the statutory

18   structure.  The point that I have just made about Section

19   (c)(2)(D) is referenced in Judge Walton's opinion in footnote 1

20   where he notes the connection between these two.

21           The plaintiffs have identified in their reply brief a

22   couple of other sources unrelated to 215 that they suggest are

23   inconsistent with this argument.  I submit that neither of them

24   are.  The first two examples again relate to implied exemptions

25   which is, given (c)(2)(D), not what the Court has to do here.

DBM8AMEA

```
1   And the third, which was an inspector general report, reflects
2   a debate within the Department of Justice about Stored
3   Communications Act before 2006 so before Section (c)(2)(D) was
4   added.
5           THE COURT:  Do you agree that the plain language of
6   Section 2702(a)(3) would prohibit the government from
7   collecting the telephone data?
8           MR. DELERY:  I think again, your Honor, you need to
9   read Section 2702 and 2703 -- 2702 is for voluntary production,
10  2703 has a provision for various forms of compelled
11  production -- in light of Section 215, and I think they are
12  different authorities.  They are providing different
13  authorities to the government.  215 is the one that's relied on
14  here.
15          Just two other points about the scope of the statutory
16  argument that I would like to address.  One goes to the
17  discussion about the usefulness of the program as a tool that
18  was raised here and also in the briefs.  I think, first of all,
19  Section 215 doesn't require the program to be crucial or the
20  least restrictive means of obtaining information.  The test is
21  relevant to an authorized investigation, which is clearly met
22  here.  Second, I think that some of the discussion has confused
23  or melded two different types of usefulness that I think it's
24  useful to separate.  One is the role of bulk collection for the
25  analytical tools that the NSA applies.
```

DBM8AMEA

1          So, therefore, both we and the FISC have said that the

2     NSA analysis would not be effective, at least on the scale that

3     it is, without the bulk history and the collection of cross

4     carriers.  So the 2006 application, for example, that has been

5     released in the FOIA production says that NSA can effectively

6     conduct metadata analysis only if it has the data in bulk.

7     Judge Egan's opinion from August of this year includes a

8     similar term.

9          So the point is that the same level of historical

10    analysis, discovery of contacts, links between known and

11    unknown terrorists, can't practically be accomplished through

12    sequenced NSL's or some of the other ideas that have been

13    identified, although certainly, as I indicated at the

14    beginning, some other options are being debated in Congress

15    that seems like the place for those.

16         The second sense of usefulness is the contribution

17    that this telephony metadata program has made to

18    counterterrorism investigations.  There, I think the discussion

19    of this subject is inconsistent.  The program, as the

20    declarations identify here, has made important contributions

21    that assists the FBI, including as a complement to other

22    investigative tools.  I don't think that there has been an

23    assertion that this should be examined in isolation.  Again,

24    the key to thwarting future attacks is to identify before they

25    occur what plans are occurring and to identify connections

DBM8AMEA

1    between people that are identified in counterterrorism

2    investigations, and others with whom they might be working,

3    including here in the United States.

4          So it's in that respect that this tool has been

5    important, one of significant value as the Holley declaration

6    reads and Judge Egan's opinion expresses in similar terms.

7          So with that, unless there are more questions about

8    the statute, I will turn to -- one other point if I might,

9    which is that the suggestion has been made that this authority

10   is limitless.  Respectfully, I think that is not the

11   government's position.  This program is tailored and focused on

12   the distinctive features of telephony metadata, in that they

13   are highly standardized, they are structured, and that analysis

14   of large data sets allows for the drawing of the connections

15   that I have been talking about.  Upholding the program here

16   doesn't sanction all bulk data collection.  There wouldn't be,

17   obviously, any other type of collection unless the FISA court

18   is willing to grant it.  But again, you need to look in any

19   other context to these same types of considerations -- the

20   nature of the records, the connection to an investigation, the

21   scope of the production sought -- and as we have said, other

22   types of bulk data, including medical records or library

23   records, would not have the same connections.

24         THE COURT:  Should the Court credit statements of

25   Senators Udall, Wyden and Heinrich, who are members of the

DBM8AMEA

Senate Intelligence Committee in the Northern District of
California case, where they assert that they have seen no
evidence that this monitoring program has provided any uniquely
valuable intelligence?

MR. DELERY:  I think, your Honor, respectfully, I
would start with the declarations that have been submitted in
this case, which do detail the role that the program plays and
some examples that could be discussed publicly about its
connection to particular investigations.

As to the uniqueness question, again, I think there is
a blending there of the two.  Certainly, as the declarations
establish, we are not aware of another currently available
mechanism that would accomplish the contact chaining inquiry
and the analysis of connections in as timely or effective
manner as the one that's at issue in this program.  Obviously,
to the extent that those senators have different views on that,
again, they are currently debating proposals that include
potential changes to the program, it seems like that's the
venue.  But ordinarily, I think, in national security matters,
the Supreme Court has said courts should defer to the
professional judgment of the national security professionals,
here that would be reflected in the declarations that have been
submitted in this record.

With that then, your Honor, I will turn to the Fourth
Amendment.  The government's position is that the Fourth

DBM8AMEA

1   Amendment challenge is foreclosed by *Smith v. Maryland*, which

2   held that there is no reasonable expectation of privacy in the

3   non-content information that's held by third parties.  So the

4   metadata at issue here or the same type of information was at

5   issue in *Smith*, telephone numbers.

6          THE COURT:  Doesn't the information collected here

7   reveal far more about a person than the information collected

8   on one suspect for a few days in *Smith*?

9          MR. DELERY:  Potentially, the aggregation of the data

10  can be a powerful tool.  That's the reason for the collection.

11  In fact, going back to the usefulness point that we were just

12  making, the Felten declaration confirms the value of the tool.

13  The reasons why Professor Felten identifies, you can use the

14  data to draw connections, learn information, for a different

15  purpose, but the same type of analysis that the NSA applies.

16  The key question is, who are you using it for?  And here the

17  program is tailored to people who are suspected of having a

18  connection to terrorism and not for other purposes.

19          I think the other key distinction between *Smith*, and

20  *Jones* for that matter, is that there you're gathering

21  information about a known person, about an individual person,

22  and the metadata is associated with that person.  In the

23  telephony metadata program, the business records that are

24  collected from the telecommunications carriers are not tied to

25  identifying information.  Therefore, it's only later, after an

DBM8AMEA

1    appropriate query triggered by a suspicion of an association

2    with terrorism, that you could identify the information with an

3    individual.  It's a key distinction.  So in some ways the

4    relevant analogy is not the collection, but the querying here

5    to the framework that was at issue in *Smith*.

6         *Smith's* holding, though, it's true it was about an

7    individual and a couple of days, as opposed to the program that

8    has a broader scope as we have here, but its holding was about

9    the expectation of privacy that everyone has in a particular

10   type of data.  And the court's clear conclusion was that there

11   is no reasonable expectation of privacy in this type of

12   metadata that is conveyed to third parties, the phone

13   companies.  People assume that when they use the phone, the

14   phone company is recording the number dialed and how long the

15   call lasts and the like, and we know that because all of us get

16   the bills that detail the calls.  That was the key insight of

17   the Supreme Court's decision in *Smith*.  In fact, the dissent in

18   that case made many of the same arguments that are being made

19   here.  Noted that from a pattern of calls, if the calls are

20   associated with an individual, you could learn information

21   about that person, and, nevertheless, the court held that there

22   is no reasonable expectation of privacy in that information.

23        Couple that holding with the Supreme Court's clear

24   statement in *Rakas* and other cases that the Fourth Amendment

25   right is personal, can't be asserted vicariously, then those

DBM8AMEA

holdings control the outcome of the Fourth Amendment question

in this case.  Certainly, in *United States v. Jones*, as has

been identified, Justice Sotomayor in her conferring opinion,

and in Justice Alito's, but particularly Justice Sotomayor's,

suggested that this question, this so-called third party

doctrine, may at some point warrant reconsideration.

THE COURT:  Is the expectation of privacy affected by

the Stored Communications Act's prohibitions on turning that

information over?

MR. DELERY:  I don't think so.  I think given *Smith*

and given the ways in which the information is used, and people

understand that this information is in the hands of a third

party, in the hands of a business, uses it for its own

purposes, billing and fraud detection, and, also, under the

Stored Communications Act, may be required to provide it to the

government for various purposes.  And certainly Section 215,

like the Stored Communications Act, would be one of the

background authorities under which, when a provider says we are

going to handle the records consistent with applicable law and

authority, that would be one of them.

THE COURT:  Haven't Justice Sotomayor and Justice

Alito and several others in *Jones* indicated that the third

party doctrine relied on in *Smith* may no longer be appropriate

in light of modern technology?

MR. DELERY:  Certainly, your Honor, Justice Sotomayor

DBM8AMEA

1   and Justice Alito, but again, particularly Justice Sotomayor,

2   suggested that it may warrant reexamination, but she did not

3   identify what the answer would be to that question.  So hasn't

4   provided any standard that could be applied in a case like this

5   in place of the very clear *Smith* standard.

6           In fact, that's a conclusion that the FISC has already

7   reached.  Judge McLaughlin's most recent opinion addressed that

8   question.  Last week, the Southern District of California in

9   the *Roland* case came to that conclusion, and the District of

10  Maryland last year in a case called *Graham* noted that the

11  Supreme Court had not yet resolved this question about the

12  effective aggregation and new technology on the third party

13  doctrine, and until then the established law needed to apply.

14  Given the Supreme Court's repeated admonitions that predictions

15  of an overruling of clear prior rulings should be avoided and

16  that all of us, the government and the court, should wait for

17  the Supreme Court's own resolution of those questions, leads to

18  the conclusion that *Smith* still controlled here on the question

19  of whether there is a search.

20          I should indicate that even before *Jones*, lower

21  courts, a number of cases cited in our briefs, had made clear

22  that call detail records, like the ones at issue here, don't

23  come with a reasonable expectation of privacy so collecting

24  them is not a search.

25          Obviously, as we have argued, to the extent that the

DBM8AMEA

1    Court turned to a reasonableness inquiry, we think that we

2    would still prevail.  Any search, if one existed, would be

3    reasonable in light of the government's compelling interest in

4    the purpose of the statute, counterterrorism investigations.

5    The tailored intrusion, if there is any one, on the data of the

6    plaintiffs, again, given the restrictions on the querying and

7    the lack of any evidence that the plaintiffs' data has actually

8    been reviewed by any person is likely in any way, that's not in

9    the record.

10            Indeed, I will point out as to that, the plaintiffs

11   don't seem to challenge the RAS standard.  In fact, again in

12   their briefs, to the extent that they suggest anything as an

13   alternative, it would be to seek the phone records only of

14   people who have an articulable suspicion of being associated

15   with terrorism.  So to the extent that there is a querying of

16   data that would happen to turn up records of any individual

17   person, I don't read the plaintiffs to be challenging that as a

18   Fourth Amendment problem, even under the existing framework.

19            And as I indicated earlier, the framework was imposed

20   for a reason.  It is designed to be carefully tailored.  And

21   the safeguards, by limiting both the use and the retention and

22   the dissemination of the information outside of the NSA, and

23   then an oversight structure on top of that, are protective of

24   Fourth Amendment interests.  Under a standard reasonableness

25   inquiry, this program would pass muster.

DBM8AMEA

1          THE COURT:  Do you want to turn to the First

2     Amendment?

3          MR. DELERY:  The First Amendment claim fails as a

4     matter of law because the plaintiffs haven't alleged or proved,

5     for purposes of the preliminary injunction, that the telephony

6     metadata program is directed at their expressive or

7     associational activities in any way.  Good faith government

8     investigations, conducted consistent with the Fourth Amendment,

9     do not violate the First Amendment, as long as they are not

10    pursued with the purpose to deter or penalize protected

11    expression.  And that distinguishes this situation directly

12    from the *Tabaa* case to which Mr. Jaffer referred.

13          In that case, the investigation was being pursued

14    because individuals had attended a particular conference in

15    Canada.  It was based on expressive activities.  Here, there is

16    no sense of that.  The First Amendment claim is based on a

17    hypothesis that, as we have established, is wrong that

18    associational activities are actually being pursued, and there

19    is also no evidence of an actual chilling effect and any actual

20    person has declined to speak to the plaintiffs or otherwise has

21    changed their course of conduct.

22          THE COURT:  How can it be though that the Fourth

23    Amendment is the only protection of interest started by the

24    First Amendment?

25          MR. DELERY:  That is not the position of the

DBM8AMEA

1    government, your Honor.  Although that was attributed to us,

2    that is not the case.  The point is that where an investigation

3    is being conducted in good faith, consistent with the Fourth

4    Amendment, in order for there to be a First Amendment

5    violation, there needs to be some actual targeting of

6    expressive activity or a desire to deter or punish First

7    Amendment activity, and that's the element that is missing

8    here.  So it's not that the First Amendment doesn't add

9    anything to the analysis.  It's not applicable to this program

10   and certainly hasn't been proved on the record in this case.

11             THE COURT:  Could a good faith investigation

12   substantially impair the freedom of association?

13             MR. DELERY:  As a theoretical matter?

14             THE COURT:  Yes.

15             MR. DELERY:  That, as I understand it, there has been

16   some debate in the cases about whether it is possible at any

17   level.  Certainly here I don't think that that is the case, and

18   we are not at a situation where that would be put into play.

19   And for that reason, I think this is very different from the

20   cases like *NAACP v. Alabama* or the *Shelton* case that the

21   plaintiffs have cited, all of which involve, again, the

22   obtaining of membership information, or in the case of the

23   *Shelton* case, a listing of one's associations, but attributed

24   to a particular organization or individual.  Again, the tying

25   of information to an individual or a particular organization.

DBM8AMEA

1        Here, the metadata, as collected by the telephony

2    metadata program, is not tied to the identification of any

3    individual.  And so there is no mechanism just from the

4    collection to identify which of all of the numbers in there, if

5    any, show connections between the plaintiffs and any of the

6    other people that they are concerned about.  And so that's a

7    fundamental distinction from the types of cases that the

8    Supreme Court has recognized require exacting scrutiny.

9        We further submit that if that test did apply, given

10   the fact that this serves compelling governmental interests

11   that are unrelated to the expression of ideas and the careful

12   tailoring, the protections that are imposed on the identifying

13   ability to connect metadata to identifying information, this

14   program would satisfy that kind of First Amendment inquiry if

15   you got there.  But given the threshold issues, we don't think

16   that would be appropriate.

17        Thank you.

18        THE COURT:  Thank you very much, Mr. Delery.

19        A brief rebuttal, Mr. Jaffer.

20        MR. JAFFER:  First, on the provision you raised

21   earlier, 1861(f)(2)(D), I just wanted to give you a fuller

22   response to your question, a few things that you should keep in

23   mind when you read that provision.

24        First, it appears in the section that it is entirely

25   about challenges by providers, and I think that it has to be

DBM8AMEA

read in that limited context.

Second, the point I made earlier, which is that we are not seeking modification of the 215 order.  We are challenging the conduct of executive officials.

Third, the legislative history, as I mentioned earlier, makes clear that that provision was meant to protect the 215 order on appeal.  That was the narrow purpose that that provision was meant to serve.

Fourth, to the extent there is ambiguity in the meaning of that provision, there is of course the background rule from the APA that requires a court interpret the provision in a way to preserve the right of judicial review rather than to preclude it.

Fifth, if you want to see what a real preclusion provision looks like, you can look at the Stored Communications Act.  Section 2708 says, "The remedies and sanctions described in this chapter are the only judicial remedies and sanctions for nonconstitutional violations of this chapter."  I think that is clear language.  The language in (f)(2)(D) does not read anything like that.

Then, finally, your Honor, if you do find that that particular provision precludes our statutory claims, I just want to remind you of what is probably obvious.  It doesn't preclude our constitutional claims.  And if it were read to preclude the constitutional claims, that in itself would raise

DBM8AMEA

1  difficult constitutional questions.

2      Finally, your Honor, the government says, I think

3  correctly, that we have not spelled out the precise contours of

4  Section 215.  We can't do that.  I think that's in part because

5  the application of the statute in any particular case will

6  depend on the context, it will depend on the factual context.

7      The point that I was trying to make earlier is just

8  that to accept the government's theory of the statute is to

9  accept that Congress used familiar language, the same language

10  that it has used in many other authorities, or similar language

11  to the language it has used in many other authorities, to

12  authorize collection on a truly massive scale, collection far

13  beyond what any court has previously sanctioned, and indeed,

14  far beyond what the government has ever previously proposed.

15  The Supreme Court has admonished many times that Congress

16  doesn't hide elephants in mouse holes.  I think that is what

17  the government is proposing here.  At the very least, your

18  Honor, this Court should require Congress to say that it wants

19  the government to collect all of this data, if it does indeed

20  want it.

21      Thank you.

22      THE COURT:  Thank you, Mr. Jaffer.

23      Mr. Abdo.

24      MR. ABDO:  Just quickly to address the government's

25  discussion of standing.  I think it's quite clear that we have

DBM8AMEA

1    at least three separate injuries, and we have standing for each

2    one, but I don't really want to spend much more time discussing

3    our principal claim, which is that collection of plaintiffs'

4    call records is sufficient for purposes of both our statutory

5    claim and our constitutional claims.  That much is clear at

6    least from the Second Circuit's decision in *Amidax*, which

7    upheld that if the plaintiff in that case could demonstrate

8    that their financial records had been transferred to the

9    government, that would have been sufficient to raise their

10   claims on the merits.

11          We separately are injured by the government's later

12   querying of the database.  Every time they query it, they test

13   to see whether a call is within three hops of those of

14   suspected terrorists.  I think there is no question but that

15   that would separately give us standing.  But again, our

16   principal claim is that the government's collection alone is

17   sufficient.

18          I also want to briefly discuss the government's

19   discussion of necessity, which I think cuts across all three of

20   our claims.  Our position is, I think, best articulated in the

21   declaration of Professor Felten, the supplemental declaration,

22   which makes clear that the government could accomplish the very

23   same type of analysis it is trying to accomplish through the

24   construction of this database without in fact constructing a

25   database.  It could use orders directed at the telecoms to

DBM8AMEA

1    acquire the phone records of anyone within three hops of their

2    suspect.  That's at paragraphs 6 to 8 of the supplemental

3    declaration.

4          With respect to your Honor's question about what

5    deference is owed either to the amicus brief filed in

6    California on behalf of the intelligence committee senators

7    versus the government's declarations in this case, it's of

8    course appropriate to consider the government's declarations,

9    but to also apply a sense of common sense.  None of the

10   examples that the government has provided as supposed success

11   stories of this program even involve the sort of multi-hop

12   analysis that they claim the program is necessary for.  Both of

13   the examples they relied upon employed only a simple one-hop

14   analysis, one that would be very easy for the government to

15   accomplish through targeted means.  And even if they involved

16   more complicated investigations, Professor Felten lays out how

17   they could analyze multi-hop investigations using those same

18   target authorities.

19         A word on the government's First Amendment arguments

20   before just one final word on the Fourth Amendment.

21         I think it's misleading to say that our case doesn't

22   involve one directed at First Amendment activities.  The very

23   purpose of the government's program is to collect plaintiffs'

24   associational information for the purpose of determining

25   whether we are in association with those that the government

DBM8AMEA

1    suspects of wrongdoing.  It could not be more directly

2    addressed to information protected by the First Amendment.

3            But even if it weren't, all of the cases that we cite,

4    particularly in our reply brief, make clear that even indirect

5    burdens on the First Amendment require exacting scrutiny

6    analysis by the court.  I am thinking particularly about the

7    Supreme Court's decision in *Arizona Free Enterprise*, but also

8    decisions of the Second Circuit in *Local 1814* and the decision

9    of the D.C. Circuit in *Clark v. Library of Congress*.

10           Finally, just a general comment on the government's

11   Fourth Amendment position.  I think it's worth stepping back

12   and appreciating the consequences of the government's position.

13   Under the government's interpretation of the Fourth Amendment,

14   it would be free to construct databases housing all manner of

15   extraordinarily sensitive information about even innocent

16   Americans, information in which they have not only an

17   expectation of privacy, but that would reveal extraordinarily

18   sensitive details about their personal lives.

19           The government's position is not just that that

20   information is not protected by the Fourth Amendment, but that

21   the government's collection doesn't even raise a controversy

22   within the meaning of Article III of the Constitution.  I think

23   it's worth pausing before accepting that principle because the

24   end result of it will be extraordinarily sensitive databases

25   that ordinary Americans will have no recourse for unless they

DBM8AMEA

1   can prove in a rare case that the government has specifically

2   targeted them.

3           THE COURT:  Mr. Delery, do you wish to be heard?

4           MR. DELERY:  Yes, just briefly to respond to a couple

5   of points.

6           I think on the question of (f)(2)(D) and the provision

7   that says the order shall remain in full effect, I think there

8   is no question that the order that the plaintiffs are

9   requesting would affect the scope of the currently existing

10  orders of the FISC.  Obviously, those orders allow for certain

11  collection pursuant to the terms of the primary order, the most

12  recent one of which was attached to Judge McLaughlin's opinion,

13  and the relief that the plaintiffs seek would carve out

14  exceptions to that, and so I do think necessarily would reflect

15  a modification of the authority, and certainly the insight of

16  this provision (f)(2)(D) was to avoid exactly that kind of

17  result.

18          Certainly, I think when we are talking about

19  preliminary injunctive relief, where obviously there is no

20  right to an injunction in this context, the fact that they are

21  asking for an injunction that would at the very least modify,

22  if not otherwise interfere with an ongoing order of an Article

23  III court that has been issued pursuant to the framework that

24  Congress allowed, all of those factors counsel strongly, and I

25  would argue dispositively, against the issuance of a

DBM8AMEA

1    preliminary injunction here.

2            On the question of ratification, which obviously

3    relates to the repeated argument about the scope of Section 215

4    as interpreted by the FISC and the government, Judge Egan's

5    opinion in August from the FISC actually addressed this

6    question and noted that given that information was provided to

7    Congress on a number of occasions, that was sufficient to meet

8    the Supreme Court's test for ratification.

9            And similarly, in our opposition to the preliminary

10   injunction motion on page 22, we address some of the individual

11   statements by legislators that your Honor highlighted, and

12   noted the cases there that counsel I guess is relying on those

13   as opposed to the actual congressional votes, in terms of the

14   scope of congressional action, and that's certainly relevant

15   not only for the ratification point, but also for how you

16   interpret the statute as a whole when you put it together in

17   the context of the type of investigations that are here.

18           In terms of the scope of the Fourth Amendment

19   argument, I think it's important to note that the holding of

20   *Smith* was about non-content information.  It was not about

21   collecting the types of information that the plaintiffs

22   sometimes reference, including information about content or

23   associations of individuals.  Certainly, that's a different

24   type of information of a different order.  It wasn't at issue

25   in *Smith* and it is not at issue here.  And the type of records,

DBM8AMEA

1   the phone numbers and related information, that are at issue in

2   this program are exactly the types of records that the Supreme

3   Court in *Smith* said individuals have no reasonable expectation

4   over.

5          As to standing, there was a reference to the *Amidax*

6   decision from the Second Circuit.  The sentence that was

7   referenced comes in a discussion of whether the plaintiffs had

8   to prove the collection of an entire database or just

9   collection of their information in order to establish standing,

10  and it was not directed at the point that we are now debating

11  in this case.  And I think for the reasons that I have said

12  earlier, the plaintiffs have not identified any concrete harm

13  that flows from your collection.  Even if you think that the

14  mere collection provides enough injury to qualify for Article

15  III standing, when evaluated for purposes, for example, of the

16  preliminary injunction against the important interest in

17  national security and the harm that would come from disrupting

18  a valuable program for national security efforts, that type of

19  injury doesn't provide enough of a basis to justify the

20  injunctive relief that they ask.

21         So for purposes of the bottom line here, the motion to

22  dismiss I think can be disposed of.  Statutory claims under

23  preclusion grounds, I think when you take together all of the

24  statutory references, it's clear that statutory claims are

25  appropriately presented in the FISC structure and not

DBM8AMEA

1    elsewhere.  And on both of the constitutional claims, binding

2    Supreme Court precedent at the topline legal level resolves the

3    threshold legal questions on the expectation of privacy and on

4    the need to show some actual effect on associational interest.

5    Those cases are enough to dispose of the claims in the case,

6    and we therefore submit that the motion to dismiss should be

7    granted.

8            On the preliminary injunction, obviously the same

9    legal issues apply.  And, certainly, where we are talking about

10   an ongoing program that has been approved by the Article III

11   court established to hear that repeatedly, 35 occasions by 15

12   different judges, and where we submit has been briefed to

13   Congress, and where Congress has extended the authority with

14   information about how it is being used, the ordinary analysis

15   that the Court would ordinarily apply in evaluating a

16   preliminary injunction counsel is strongly against doing so

17   here.  To the extent that the program should be modified, the

18   appropriate forum for that is the current debate ongoing in

19   Congress.  This Court should, respectfully, leave this

20   important national security program on its firm footing as

21   approved by the FISC.

22           THE COURT:  Thank you, Mr. Delery.

23           Counsel, I want to thank all of you for your

24   arguments.  This has been a wide-ranging discussion.  I have an

25   a lot to think about.  Decision reserved.

DBM8AMEA

1              Have a good weekend.

2              (Adjourned) r